**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**ALBERT N. SEDGES,** Plaintiff,

v.

**MARTIN BARBATO,** Defendant.

**Case No.: 2:25-cv-17354-ES**

## NOTICE OF MOTION

**TO: Office of the Attorney General**
RJ Hughes Justice Complex
P.O. Box 080
Trenton, NJ 08625

**PLEASE TAKE NOTICE** that Plaintiff, Albert N. Sedges, appearing *pro se*, hereby moves before the United States District Court for the District of New Jersey for an Order denying the Defendant's Motion to Dismiss.

**PLEASE TAKE FURTHER NOTICE** that in support of this motion, Plaintiff relies upon the attached Supplemental Certifications (Items 1–10) and the attached Exhibits (Transcripts A–D), which provide forensic proof of the Defendant's non-judicial acts and the resulting constitutional breakdown.

Plaintiff requests that the Court deny the Defendant's motion in its entirety and grant such other relief as the Court deems just and equitable.

**Dated:** March 17, 2026

**ALBERT N. SEDGES**
*Plaintiff Pro Se*
201 South Rodgers Rd.
Hot Springs, AR 71960

**(1)**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ALBERT N. SEDGES, Plaintiff,

v.

MARTIN BARBATO, Defendant.

Case No.: 2:25-cv-17354-ES

## [PROPOSED] ORDER DENYING DEFENDANT'S MOTION TO DISMISS

**THIS MATTER** having been opened to the Court by Plaintiff Albert N. Sedges, appearing *pro se*, on a motion for an Order denying Defendant's Motion to Dismiss; and the Court having considered the Supplemental Certifications and exhibits submitted by the Plaintiff; and for good cause shown;

**IT IS** on this _____ day of _____, 2026,

**ORDERED** that the Defendant's Motion to Dismiss based on the doctrine of absolute judicial immunity is hereby **DENIED**; and it is further

**ORDERED** that the Court finds the Plaintiff has presented sufficient forensic evidence of non-judicial administrative acts performed in the clear absence of all jurisdiction; and it is further

**ORDERED** that a copy of this Order shall be served upon all parties within _____ days of the date hereof.

**HON. ESTHER SALAS, U.S.D.J.**

(2)

## NOTICE OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**TO: THE CLERK OF THE COURT**
**AND TO: Office of the Attorney General of New Jersey**
R.J. Hughes Justice Complex
25 Market Street, Trenton, NJ 08625

**PLEASE TAKE NOTICE** that Plaintiff, Albert N. Sedges, appearing Pro Se, hereby files this Opposition to the Defendant's Motion to Dismiss due to Judicial Immunity, **filed on March 3, 2026.**

In support of this Opposition, Plaintiff relies upon the accompanying Brief, the Statement of Facts, the Supplemental Certifications, and the Table of Exhibits containing the relevant transcripts and documentation from the underlying matter.

Respectfully submitted,

**ALBERT N. SEDGES**
*Plaintiff Pro Se*
**Dated: March 15, 2026**

## CERTIFICATE OF SERVICE

I, **ALBERT N. SEDGES**, hereby certify that on this **15th day of March, 2026**, I caused a true and correct copy of the following documents:

1. **Notice of Plaintiff's Opposition to Defendant's Motion to Dismiss;**
2. **Plaintiff's Brief in Opposition** (including Preliminary Statement, Legal Argument, Statement of Facts, and Conclusion);
3. **Supplemental Certification of Albert N. Sedges;**
4. **Table of Exhibits** (including all cited Transcripts and Records); and
5. **Proposed Order Denying Defendant's Motion to Dismiss**

to be served upon the following party of record via **U.S. First Class Mail** at the address listed below:

**Office of the Attorney General of New Jersey**
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 080
Trenton, NJ 08625

I certify under penalty of perjury that the foregoing is true and correct.

**Dated: March 15, 2026**

**ALBERT N. SEDGES**
*Plaintiff Pro Se*

**(3)**

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

**ALBERT N. SEDGES, Plaintiff,**

**v.**

**MARTIN BARBATO, Defendant.**

**CASE NO.: 25-cv-17354-ES-JBC Hon. Esther Salas, U.S.D.J.**

# SUPPLEMENTAL CERTIFICATION OF ALBERT N. SEDGES: CLERICAL CORRECTION TO PRELIMINARY STATEMENT

**I, ALBERT N. SEDGES, of full age, do hereby certify as follows:**

1. I am the Plaintiff Pro Se in the above-captioned matter. I submit this Supplemental Certification for the limited purpose of correcting a clerical cross-referencing error contained within my **Preliminary Statement.**

2. Within the body of the Preliminary Statement, there are two (2) instances where the text directs the Court to **"See Block 4"** regarding specific evidentiary support.

3. I wish to clarify for the Court that these references contain a typographical error. The evidence intended for the Court's review is not located in Block 4, but is instead located in the section titled: **"Priority Supplemental Certification: Block 3."**

4. All substantive arguments and forensic analysis remain as stated; this Certification serves only to ensure the Court and the Defense can accurately locate the corresponding exhibits within the voluminous record.

**I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.**

Dated: **3/26/26**

Signed: _____

**Albert N. Sedges, Plaintiff Pro Se**

# PROOF OF SERVICE

I, **Albert N. Sedges**, hereby certify that on this date, I have served a copy of the foregoing **Supplemental Certification of Clerical Correction** upon the following party via **First-Class Mail**:

**Office of the Attorney General of New Jersey Richard J. Hughes Justice Complex 25 Market Street, P.O. Box 112 Trenton, NJ 08625** *(Counsel for Defendant Martin Barbato)*

Dated: **3/26/26**

(141)

Signed: _____

**Albert N. Sedges, Plaintiff Pro Se**

( 5)

**SUPPLEMENTAL CERTIFICATION OF ALBERT SEDGES**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ALBERT SEDGES,
Plaintiff,

v.

DEFENDANT BARBATO,
Defendant.

Civil Action No.: 25-cv-17354

## I. PRELIMINARY STATEMENT

This Opposition is submitted to demonstrate that the Defendant is not entitled to judicial immunity for the systemic violation of federal law and the Plaintiff's constitutional rights. The Defendant's actions "shock the conscience" and constitute a direct denial of **14th Amendment Due Process**.

As this Court takes into consideration my opposition, it will see as it moves through these papers the gravity of the violations being claimed. The core of this matter involves the direct and calculated violation of **42 U.S.C. § 407**. The Defendant sought to forcibly attach the Plaintiff's Social Security Disability (SSDI)—his **only source of income**—to pay for expenses in his domestic household and marriage, under the false pretense that such an attachment was "status quo." Furthermore, as the evidence will show, the Defendant reached beyond the household and **succeeded** in his illegal objective to attach and escrow the Plaintiff's protected SSDI funds from the proceeds of the sale of the marital home. Under the rule of transmutation and the holding in **Philpot v. Essex County Welfare Board**, these funds are federally protected and immune from any legal process (**See Block 4**). This fact was explicitly verified and admitted within the **October 8, 2025 transcript**. In that transcript, the Defendant himself, while questioning the Plaintiff, Mr. Sedges, brings out the actual verbal evidence of exactly how the mortgage is paid and where the funds actually come from. The Defendant performed a "deep dive" into the questioning of the Plaintiff regarding how he executes the mortgage payment, establishing a clear record of the protected nature of these funds. This record directly contradicts the **February 13, 2026 Order**—a clear and documented violation of these federal protections.

Furthermore, Defendant Barbato lacks immunity because he has acted as a **direct and interested adversary. The Court is directed to Block 1 of the Table of Exhibits**, which contains the documentation of the following "File Dumps" issued while the Defendant was a **Federal Defendant under Summons**. In late 2025, while this federal lawsuit was in its **pendente stage**, Defendant Barbato issued a "Boilerplate File Dump" of 7 motions (3 in November, 4 in December) which lacked any Statement of Reasons. This was followed on **February 3, 2026**, while he was a **Federal Defendant under Summons**, by a massive "File Dump" of **22 motions** in a single day, where **21 were denied** without a Statement of Reasons. Most recently, on **February 27, 2026**, while still a **direct adversary under Federal Summons**, the Defendant issued yet another "File Dump" of **five orders** lacking any Statement of Reasons. It is a fundamental violation of the law for a **Federal Defendant** to continue adjudicating over the "life and limb" and the protected survival funds of the very individual who is suing him.

Under the **14th Amendment**, these actions constitute a total denial of **Due Process**. As mandated by the **United States Supreme Court**, the absence of a Statement of Reasons is a fatal procedural defect that renders an appeal impossible. Because the Defendant refused to provide the required legal reasoning, the Plaintiff was stripped of his right to be heard in the Appellate Division. Any argument by

(6)

the Attorney General that the Plaintiff had a remedy in the Appellate Division is false; that remedy did not exist because there was no record to appeal. Many of these motions were held for over 60 days out of time, **as the record will show**, forcing the Plaintiff to refile, **as the record will show**, simply to preserve his rights. What the Defendant characterizes as "vexatious" was a functional necessity created by the Court's own deliberate indifference while the federal litigation was in its **pendente stage**.

Finally, on **February 13, 2026**, Defendant Barbato improperly escrowed **$11,750** of protected SSDI funds for the benefit of a third-party attorney, Mrs. DeSimone (**See Block 4**), who is a stranger to the marital matter and has never filed an appearance. This Court cannot allow the shield of immunity to protect a defendant who is under a federal summons to adjudicate over matters where he finds himself as a direct adversary to the plaintiff in this federal lawsuit. If there ever was a definition of a **Conflict of Interest**, this is it.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**Dated:** March 18, 2026

**ALBERT SEDGES**
*Plaintiff, Pro Se*

**CERTIFICATE OF SERVICE**

I, **ALBERT SEDGES**, certify that on this **18th day of March, 2026**, I served a copy of the within Supplemental Certification and Preliminary Statement upon the **Attorney General of New Jersey** at the following address:

**Office of the Attorney General**
**Richard J. Hughes Justice Complex**
**25 Market Street, P.O. Box 080**
**Trenton, NJ 08625**

Service was made via **U.S. Certified Mail, Return Receipt Requested**.

**Dated:** March 18, 2026

**ALBERT SEDGES**
*Plaintiff, Pro Se*

**(7)**

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

ALBERT N. SEDGES, Plaintiff,

v.

MARTIN BARBATO, Defendant.

CASE NO.: 25-cv-17354-ES-JBC Hon. Esther Salas, U.S.D.J.

# SUPPLEMENTAL CERTIFICATION OF ALBERT N. SEDGES: CLERICAL CORRECTION TO LEGAL ARGUMENT IN SUPPORT OF PLAINTIFF'S OPPOSITION

I, ALBERT N. SEDGES, of full age, do hereby certify as follows:

1. I am the Plaintiff Pro Se in the above-captioned matter. I submit this Supplemental Certification for the limited purpose of correcting clerical cross-referencing errors contained within my **Legal Argument in Support of Plaintiff's Opposition**.

2. Within the body of the Legal Argument, there are instances where the text directs the Court to **"See Block 4"** regarding specific evidentiary support.

3. I wish to clarify for the Court that these references contain a typographical error. The evidence intended for the Court's review is not located in Block 4, but is instead located in the section titled: **"Priority Supplemental Certification: Block 3."**

4. Additionally, within the Legal Argument, there is a reference directing the Court to **"See Block 6"** regarding the **October 8, 2025, hearing transcript**.

5. I wish to clarify for the Court that this reference is also incorrect. The October 8, 2025, hearing transcript is located in the section titled: **"Priority Supplemental Certifications: Block 4 Mandatory Review."**

6. All substantive arguments and forensic analysis remain as stated; this Certification serves only to ensure the Court and the Defense can accurately locate the corresponding exhibits within the voluminous record.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: **3/26/2026**

Signed: _____

Albert N. Sedges, Plaintiff Pro Se

# PROOF OF SERVICE

(8)

I, **Albert N. Sedges**, hereby certify that on this date, I have served a copy of the foregoing **Supplemental Certification of Clerical Correction** upon the following party via **First-Class Mail**:

**Office of the Attorney General of New Jersey Richard J. Hughes Justice Complex 25 Market Street, P.O. Box 112 Trenton, NJ 08625** *(Counsel for Defendant Martin Barbato)*

Dated: __3/26/2026__

Signed: _____

**Albert N. Sedges, Plaintiff Pro Se**

(9)

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

ALBERT SEDGES,
Plaintiff,

v.

DEFENDANT BARBATO,
Defendant.

Civil Action No.: 25-cv-17354

TO: THE HONORABLE ESTHER SALAS, U.S.D.J.

## LEGAL ARGUMENT IN SUPPORT OF PLAINTIFF'S OPPOSITION

**POINT I**
**THE DEFENDANT'S SYSTEMIC PATTERN OF FORCIBLE ATTACHMENT AND ESCROW OF PROTECTED SOCIAL SECURITY DISABILITY FUNDS CONSTITUTES A DIRECT VIOLATION OF 42 U.S.C. § 407 AND CONTROLLING SUPREME COURT PRECEDENT.**

The Social Security Act, specifically **42 U.S.C. § 407(a)**, provides an "unambiguous" and "total" exemption of Social Security benefits from execution, levy, attachment, garnishment, or other legal process. As held in **Philpot v. Essex County Welfare Board**, 409 U.S. 413 (1973), these funds remain protected even after deposit and cannot be reached by any judicial order.

In the matter at bar, the Defendant engaged in a calculated and sustained violation of these federal protections. Specifically, as documented in **Block 8 of the Table of Exhibits (The Four Orders of Violation)**, Defendant Barbato issued orders on **April 23, 2025, September 12, 2025**, and **September 19, 2025**, which forced the Plaintiff to pay marital domestic expenses despite the Defendant's documented knowledge that the Plaintiff is a Social Security Disability recipient with no other income. **Crucially, the Defendant never released the Plaintiff from these orders and never acted to correct them, maintaining this illegal enforcement up until the October 8, 2025 hearing.**

This pattern of illegality culminated in the **February 13, 2026 Order (Block 4)**, where the Defendant successfully escrowed **$11,750** of the Plaintiff's protected SSDI funds for the benefit of a third-party attorney, Mrs. DeSimone. This action was taken after the Defendant's own "deep dive" in the **October 8, 2025 hearing (Block 6)** verified the protected nature of these funds. It must be noted that the Defendant has **failed to produce a record** of these proceedings; the only record of these violations exists through the **Plaintiff's transcripts**. By repeatedly and successfully attaching these funds and refusing to release the Plaintiff from illegal orders, the Defendant acted in clear absence of all jurisdiction and violated a clearly established federal right, thereby forfeiting any claim to judicial immunity.

**POINT II**
**THE DEFENDANT'S REPEATED ISSUANCE OF ORDERS LACKING A STATEMENT OF REASONS CONSTITUTES A DENIAL OF 14TH AMENDMENT DUE PROCESS.**

(10)

As the record will show in **Block 1**, the Defendant engaged in a pattern of "File Dumps"—specifically the **22-motion dump on February 3, 2026**. By refusing to provide a Statement of Reasons, Defendant Barbato created a procedural vacuum that rendered the Plaintiff's right to appeal a nullity. This was a deliberate tactic used by a **Federal Defendant under Summons** to obstruct the Plaintiff's access to the courts, violating the fundamental Due Process requirements of the **14th Amendment**.

## CERTIFICATION OF TRUE COPY

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**Dated:** March 18, 2026

**ALBERT SEDGES**
*Plaintiff, Pro Se*

## CERTIFICATE OF SERVICE

I, **ALBERT SEDGES**, certify that on this **18th day of March, 2026**, I served a copy of the within Legal Argument and Supplemental Certification upon the **Attorney General of New Jersey** at the following address:

**Office of the Attorney General**
**Richard J. Hughes Justice Complex**
**25 Market Street, P.O. Box 080**
**Trenton, NJ 08625**

Service was made via **U.S. Certified Mail, Return Receipt Requested**.

**Dated:** March 18, 2026

**ALBERT SEDGES**
*Plaintiff, Pro Se*

( 11 )

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

**ALBERT N. SEDGES, Plaintiff,**

**v.**

**MARTIN BARBATO, Defendant.**

**CASE NO.: 25-cv-17354-ES-JBC Hon. Esther Salas, U.S.D.J.**

# SUPPLEMENTAL CERTIFICATION OF ALBERT N. SEDGES: CLERICAL CORRECTION TO TABLE OF EXHIBITS AND SUPPLEMENTAL CERTIFICATIONS

**I, ALBERT N. SEDGES, of full age, do hereby certify as follows:**

1. I am the Plaintiff Pro Se in the above-captioned matter. I submit this Supplemental Certification for the limited purpose of correcting the organizational sequence and cross-referencing within my **Table of Exhibits and Supplemental Certifications**.

2. Within the original Table of Exhibits, the document titled **"Supplemental Certification of Albert N. Sedges: Summary of Exhaustion and Constitutional Necessity"** was previously identified and located at **Block 8.**

3. I wish to clarify for the Court that for the purpose of Judicial Economy and to provide immediate context for the voluminous record, this specific Certification has been moved to the **front** of the exhibit package.

4. The **Summary of Exhaustion and Constitutional Necessity** should now be recognized as the opening document of the evidentiary record, notwithstanding any prior reference to "Block 8."

5. All substantive arguments and forensic analysis remain as stated; this Certification serves only to ensure the Court and the Defense can accurately navigate the revised order of the exhibits.

**I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.**

Dated: 3/26/2026

Signed:

**Albert N. Sedges, Plaintiff Pro Se**

# PROOF OF SERVICE

I, **Albert N. Sedges**, hereby certify that on this date, I have served a copy of the foregoing **Supplemental Certification of Clerical Correction** upon the following party via **First-Class Mail**:

(12)

**Office of the Attorney General of New Jersey** Richard J. Hughes Justice Complex 25 Market Street, P.O. Box 112 Trenton, NJ 08625 *(Counsel for Defendant Martin Barbato)*

Dated: **3/26/2026**

Signed: _____

**Albert N. Sedges, Plaintiff Pro Se**

(13)

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

ALBERT N. SEDGES, Plaintiff,

v.

MARTIN BARBATO, Defendant.

CASE NO.: 25-cv-17354-ES-JVC Hon. Esther Salas, U.S.D.J.

# SUPPLEMENTAL CERTIFICATION OF ALBERT N. SEDGES: SUMMARY OF EXHAUSTION AND CONSTITUTIONAL NECESSITY

I, ALBERT N. SEDGES, of full age, do hereby certify as follows:

## I. PRELIMINARY STATEMENT: THE INUNDATION OF THE COURT

1. **The Honorable Esther Salas**, as I submit this final Summary to the Court, I must begin by expressing that **it grieves me** to inundate this Court with such voluminous documentation. I am deeply mindful of the principles of **Judicial Economy** and the immense demands placed upon the Federal Judiciary.

2. It was never my intention to present a record of this magnitude; however, under the circumstances of the last six months, this was a burden that could not be avoided. This "Mountain of Evidence"—spanning over 1,000 pages of transcripts, forensic breakdowns, and 22 supplemental certifications—was not created by my choice. It is the direct and unavoidable result of six months of **Judiciary Abuse** and administrative blockade.

## II. EXHAUSTION OF STATE REMEDIES: THE WEAPONIZATION OF OVERSIGHT

3. **Judge Salas**, the Plaintiff wishes the Court to know that prior to filing this Federal Civil Rights action, I made every exhaustive effort to resolve these deficiencies through state administrative channels. I did not seek Federal intervention lightly.

4. I have submitted **over 60 to 70 different supplemental certifications, exhibits, and records** to the **Chief Justice of the New Jersey Supreme Court, Stuart Rabner**, and the **Advisory Committee on Judicial Conduct (ACJC)**. These filings—totaling well over **500 pages**—documented the procedural breaches and constitutional violations as they were occurring.

5. Furthermore, I sought direct intervention from the Assignment Judge, **Stewart Minkowitz**, documenting the procedural breaches as they occurred. These 500+ pages of evidence were met with complete administrative silence. Not a single email or letter of respect was returned to me regarding my grievances.

6. However, the record reveals a chilling double standard in the speed of the State Judiciary: While my 60+ filings for relief were ignored for months, the Assignment Judge acted with lightning speed when the Defendant, Judge Barbato, referred me for a "Vexatious Litigant" hearing. Within

(14)

a month of the Defendant's referral—and in direct response to my filing of a Federal Civil Rights complaint—the State Court moved to label me a "Vexatious Litigant."

7. This demonstrates that the state-level remedies were not merely "ineffective"—they were weaponized to silence a litigant who dared to document judicial misconduct. I am willing to produce all 500+ pages of these prior state filings at the request of **Your Honor** to demonstrate exactly how exhaustive I have been in trying to rectify this situation through state means. I only arrived in Federal Court after the State Judiciary closed ranks to punish my attempts at redress.

## III. THE NECESSITY OF THE CURRENT RECORD

8. As the Court reviews the attached "Architecture of Attrition," it will become clear why this specific volume is necessary for this Federal action:

   - **The "Naked Order" Blockade:** Because the Defendant issued 33 denials without a single **Statement of Reasons**, I was denied my right to a reviewable record for appeal. This forced me to refile repeatedly just to obtain the basic Due Process I am owed under the law.
   - **The Forensic Truth:** I have provided the **Raw Transcripts** (Exhibits A-D) alongside my page-by-page analysis because the truth of these violations is found in the Defendant's own words.
   - **The Federal Adversary Status:** The record proves that the Defendant Judge continued to rule against me—including the illegal seizure of my **protected SSDI funds** ($11,750)—while he was actively under a Federal Summons as my legal adversary.

## IV. CONCLUSION: THE EARNED RECORD

9. To use a simple analogy, **Judge Salas**: a teacher does not "give" a student a failing grade; the student **earns** that grade through their own actions. I have not "given" the Defendant this massive filing; he has earned it through a 97% denial rate, 70-day administrative delays, and the active retaliation of labeling me "vexatious" for seeking the protection of the law.

10. I am a Pro Se litigant who simply sought the protection of his Constitutional and Federal rights. When the state forum became a "closed loop" of retaliation and obstruction, I had no choice but to turn to this Federal Court for redress. I apologize for the weight of this file, but the weight of the injustice I have experienced over these past six months is far greater.

I thank **Your Honor** for the Court's time, patience, and commitment to the Rule of Law.

**I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.**

Dated: **3/26/2026**

Signed: _____

**Albert N. Sedges, Plaintiff Pro Se**

(15)

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

**ALBERT N. SEDGES,**
Plaintiff,

v.

**MARTIN BARBATO,**
Defendant.

**Case No.: 2:25-cv-17354-ES-JBC**
**BEFORE: THE HONORABLE ESTHER SALAS, U.S.D.J.**

## SUPPLEMENTAL CERTIFICATION IDENTIFYING THE TABLE OF EXHIBITS AND SUPPLEMENTAL CERTIFICATIONS

I, **ALBERT N. SEDGES**, of full age, hereby certify the following to be true:

1. I am the Plaintiff Pro Se in the above-captioned matter and am fully familiar with the facts and circumstances set forth herein.

2. I submit this Supplemental Certification to identify and authenticate the Table of Exhibits and the sequence of Supplemental Certifications attached hereto in opposition to the Defendant's Motion to Dismiss.

3. The following index represents a true and accurate record of the evidence and sworn testimony I am presenting to this Court.

4. The Raw Transcripts (Exhibits A-D) are third-party certified records of the proceedings, while the subsequent Analysis and Supplemental Certifications constitute my sworn assertions of the constitutional and federal law violations committed by the Defendant.

## TABLE OF EXHIBITS AND SUPPLEMENTAL CERTIFICATIONS

## INTRODUCTION TO TABLE OF EXHIBITS AND SUPPLEMENTAL CERTIFICATION: FOUR RAW TRANSCRIPTS OF RECORDED HEARINGS

- **EXHIBIT A: Full Transcript of April 23, 2025** ...................................... Page **1- 30**
- **EXHIBIT B: Full Transcript of June 13, 2025** — (NOTE: ABSOLUTELY NO JUDICIAL RECORD OR STATEMENT OF REASONS EXISTS FOR THIS HEARING; THERE IS ZERO LEGAL RECORD TO JUSTIFY THE STRIPPING OF PLAINTIFF'S PRIOR FAVORABLE ORDERS) ................................................................................... Page **1 - 25**
- **EXHIBIT C: Full Transcript of September 12, 2025** ............................ Page **1 - 34**
- **EXHIBIT D: Full Transcript of October 8, 2025** — (NOTE: ABSOLUTELY NO JUDICIAL RECORD OR STATEMENT OF REASONS EXISTS FOR THIS HEARING; THERE IS ZERO

(16)

LEGAL RECORD TO JUSTIFY THE STRIPPING OF PLAINTIFF'S PRIOR FAVORABLE ORDERS) ................................................................. Page **1-41**

## PLAINTIFF'S FORENSIC ANALYSIS OF CONSTITUTIONAL & FEDERAL VIOLATIONS

*(Surgical Strikes breaking and piercing the Judicial Immunity Shield)*

- **ANALYSIS 1: April 23, 2025 Transcript Audit** ...................................... Page **20-95**
- **ANALYSIS 2: June 13, 2025 Transcript Audit** ...................................... Page **96-205**
- **ANALYSIS 3: September 12, 2025 Transcript Audit** ........................... Page **206 365**
- **ANALYSIS 4: October 8, 2025 Transcript Audit** .................................... Page **366-520**

## PRIORITY SUPPLEMENTAL CERTIFICATIONS

- **1. PRIORITY SUPPLEMENTAL CERTIFICATION: FORENSIC TRANSCRIPT PAGE-BY-PAGE VIOLATIONS FORENSIC LEGAL ANALYSIS:** Every single page of every single transcript has been broken down to a federal violation of my rights. This includes a Preliminary Statement, a Statement of Facts, and a Statement of Argument for every transcript, providing a technical breakdown of federal and constitutional violations rather than mere testimony. ................................................................... Page **20-520**

- **2. PRIORITY SUPPLEMENTAL CERTIFICATION: PLAINTIFF'S EMERGENCY STAY / FEDERAL OPINION / DEFENDANT JUDGE'S VIOLATION OF SOCIAL SECURITY DISABILITY FUNDS RE: Philpott v. ESSEX COUNTY WELFARE BOARD FEDERAL SUPREMACY VIOLATION:** Documenting the Defendant's direct defiance of Federal law and the specific protections afforded under *Philpott v. Essex County Welfare Board*, occurring immediately following the Federal Court's recent opinion. .........**521-542**.......... Page

- **3. PRIORITY SUPPLEMENTAL CERTIFICATION: MOTION TO STRIKE / PHILPOTT v. ESSEX COUNTY WELFARE BOARD / ILLEGAL ENTRY OF DEFENSE COUNCIL FEDERAL PROTECTIONS & PROCEDURAL VIOLATIONS:** Documenting the improper transmutation of protected SSDI funds, the Defendant's failure to apply the *Philpott* doctrine, and the unlawful entry of attorney into the matter to facilitate the seizure of exempt funds **543-577** Page

- **4. PRIORITY SUPPLEMENTAL CERTIFICATION: MANDATORY READ TRANSCRIPTS (THE SOLE SURVIVING RECORD) MANDATORY REVIEW:** Specifically the June 13, 2025, and October 8, 2025 hearings. ..........................................**578-657**... Page ___

**PLAINTIFF'S NOTICE:** The Plaintiff grieves for the Court regarding the extensive reading required; however, such a review is a manifest necessity for this action.

**THE TALE OF VIOLATIONS:** There is absolutely zero record of these hearings. This Defendant has abdicated total responsibility for creating an order or a record of these two hearings that stripped the Plaintiff of favorable orders. If it wasn't for the Plaintiff obtaining these transcripts, these hearings would never have been brought to light. Because of this failure, these transcripts are the only record that accurately tell the tale of the procedural and constitutional violations that occurred throughout this marital matter.

## EVIDENTIARY BLOCKS

( 17 )

- **BLOCK 1: THE ARCHITECTURE OF ATTRITION AND FORENSIC AUDIT OF PROCEDURAL BREACHES ROADMAP OF REFILINGS:** Itemization of the 17 distinct motions Plaintiff was forced to refile (at least twice) due to administrative blockage. **658-787** ... Page ___
  - **7 Boilerplate File Dump:** (Nov. 25, 2025–Dec. 5, 2025) – Pending Federal Summons
  - **22 Motion File Dump:** (Feb. 3, 2026) – Under Federal Summons as Defendant
  - **5 Order File Dump:** (Feb. 27, 2026) – Under Federal Summons as Defendant

- **BLOCK 2: REPRESENTATIVE SUPPLEMENTAL CERTIFICATIONS (JUDICIAL ECONOMY) 6 SELECTED CERTIFICATIONS:** Provided to the Court to establish the necessary context for the structural violations found within the 30+ File Dumps. **788-888** . Page ___ **PURPOSE:** In the interest of Judicial Economy, Plaintiff has extracted these six specific certifications (Discovery, CMC, Zoom, POA, PNA, and Reconsideration) to serve as a focused evidentiary roadmap. This selection provides the Court with a clear path to the Federal and Constitutional breakdowns while sparing the Court from the excessive time required to review the full, voluminous record of 30+ dumps.

- **BLOCK 3: ADJUDICATING IN HIS OWN CAUSE & USURPATION * First Complaint of Defendant:** (Adjudicating in his own cause) ...... **889-975** ............... Page ___
  - **Second Complaint of Defendant:** (Adjudicating in his own cause)
  - **Third Complaint of Defendant:** (Adjudicating in his own cause)
  - **Recusal Request of Defendant / Interception of Recusal to his Superior:** Documenting the Defendant's personal intervention in motions directed at his own removal.
  - **Two-Prong Fraud Upon the Court / Complaint Against Assignment Judge / Intercepted by Defendant:** (This complaint was meant for Chief Justice Stuart Rabner)

- **BLOCK 4: FOUR ORDERS: VIOLATION OF 42 U.S.C. § 407 FORENSIC ANALYSIS OF THE APRIL 23, 2025 ORDER: THE MECHANICS OF FEDERAL VIOLATION:** Documenting the retroactive ex post facto municipal attachment and the mathematical impossibility of the Defendant's financial mandates. ................**976-1014**...................... Page ___
  - **The Calculation of Theft:** The Defendant ordered the Plaintiff to pay **$1,805.00** per month ($1,135 half-mortgage, $400 electric, $120 cable, $150 utilities).
  - **The Federal Breach:** With a total Social Security Disability income of **$1,435.00**, the Defendant's order creates an immediate deficit of **-$370.00** before food or medicine.
  - **The Violation of 42 U.S.C. § 407:** By commanding the expenditure of **125%** of total federal benefits, the Defendant enacted a "Confiscatory Mandate" in clear absence of all jurisdiction.
  - **The $4,810.38 "Death Kernel" (Ordinal 10):** Documenting a single "pen-to-paper" violation requiring nearly four months of total survival income to be paid within 90 days.

- **BLOCK 5: PENDENTE LITE MOTION / RECONSIDERATION** Supplemental Certification regarding the Pendente Lite motion converted into a Reconsideration; documenting the procedural sleight-of-hand used to bypass standard motion protocols. **1015-1053**. Page ___

- **BLOCK 6: ORDER TO SHOW CAUSE / USURPATION OF AUTHORITY * Order to Show Cause / The Opposition:** (Intercepted by Defendant / Usurping Authority / Violating Plaintiff's Redress) ................................................**1054-1137**......... Page ___
  - **The Cross Motion:** (Intercepted by Defendant / Usurping Authority / Violating Plaintiff's Redress)

- **BLOCK 7: MANDATORY RECUSAL AND JUDICIAL ETHICS SUPPLEMENTAL CERTIFICATION TO SUPPORT PLAINTIFF'S CLAIMS REGARDING MANDATORY RECUSAL AND JUDICIAL ETHICS:** Documenting the Defendant's failure to recuse despite clear conflicts of

(18)

interest, personal bias, and the adjudication of matters while a named defendant in a pending federal civil rights action. ..................................................... *1138-1139* ........ Page

- **BLOCK 8: STATE REMEDY / EXHAUSTION OF ADMINISTRATIVE EFFORTS** Plaintiff has submitted into the record evidence of exhaustive, good-faith efforts to resolve these issues through the Office of the Chief Justice and the ACJC. Despite approximately 60–70 filings documenting the violations, no response or relief was provided. ................................. Page ____
  **Judicial Economy Clause:** Service receipts for all 60–70 filings are preserved and available for immediate inspection upon Court Order. **BLOCK 8 MOVED/SEE INTRODUCTION**

## CERTIFICATION

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment under **28 U.S.C. § 1746**.

Dated: March 23, 2026

**ALBERT N. SEDGES**
*Plaintiff Pro Se*

## PROOF OF SERVICE

I, **ALBERT N. SEDGES**, hereby certify that on this ____ day of March, 2026, I served a copy of the within **Notice of Motion, Proposed Order, and Plaintiff's Opposition to Defendant's Motion to Dismiss (including Table of Exhibits and Supplemental Certifications)** upon the following party via **First Class Mail**:

**Office of the Attorney General of New Jersey**
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, NJ 08625
*(Counsel for Defendant Martin Barbato)*

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: March 23, 2026

**ALBERT N. SEDGES**
*Plaintiff Pro Se*

(19)

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION/FAMILY PART
MORRIS COUNTY
DOCKET NO.:  FM-14-773-25
A.D. #

CAROL ANN SEDGES,      )
                       )            TRANSCRIPT
        Plaintiff,  )              OF
                       )          HEARING
    vs.            )
                       )
ALBERT SEDGES,      )
                       )
       Defendant.  )
-------------------------

          Place:  County Courthouse
                 Washington and Court Streets
                 Morristown, New Jersey 07963
                 (HEARD VIA ZOOM)

          Date:  April 23, 2025
BEFORE:

   HONORABLE MARTIN F. BARBATO, J.S.C.

TRANSCRIPT ORDERED BY:

   ALBERT SEDGES
   201 South Rogers Road Bldg. I Apt. 130
   Hot Springs, AR 71901

APPEARANCES:

   JOHN P. DELL'ITALIA, ESQ., (Dell'Italia &
   Santola)
   Attorney for Plaintiff, Carol Ann Sedges

   ALBERT SEDGES, PRO SE
   For Defendant

          Deborah Hashimoto
          KING TRANSCRIPTION SERVICES, LLC
          3 South Corporate Drive Suite 203
          Riverdale, New Jersey 07457

          Audio Recorded
          Recording Opr. Elsa Hernandez

2

<u>I N D E X</u>

<u>PROCEEDING</u>                                                    <u>PAGE</u>

Hearing                                                            3

Colloquy                                    3

THE COURT:  -- in the matter of Sedges v. Sedges.  Docket number FM-14-773-25.  I'll take appearance of counsel first, please.

UNIDENTIFIED MALE:  Hello.

MR. DELL'ITALIA:  Yeah, sorry, Judge.  John P. Dell'Italia, Dell'Italia and Santola, appearing for Carol Sedges.

THE COURT:  Okay.  Thank you, counsel.  And the record will reflect the parties are appearing virtually, and that the plaintiff is appearing self represented.

All right.  This hearing is on the tentative order that the Court issued with regard to the motion by the plaintiff, and the feedback received from the plaintiff was that this -- the order was acceptable.  That's right, Mr. Dell'Italia?

MR. DELL'ITALIA:  Yes, Your Honor.  The only thing that I would ask is, is that when -- you know, the time limit be placed on the defendant as to paying the back money and the -- paying the money going forward.

THE COURT:  All right.  Fair.  Okay.  We will address that.  Thank you.

All right.  Just a second please.

(Pause in proceeding)

Colloquy                                    4

THE COURT: Okay. Mr. Sedges I'll hear from you then on the motion -- excuse me, on the tentative order.

MR. SEDGES: Very good. First I'd like to address the CIS. The report -- the statement that she submitted I is -- I believe not only inaccurate, okay, but it's -- there's a tremendous amount of omissions. Some of it I believe on purpose, some of it just by mistake. But to be honest with you, there's a passive mistake and there's an active mistake --

THE COURT: Well, Mr. -- Mr. Sedges --

MR. SEDGES: --

THE COURT: -- first off -- first off I should have sworn you in. So let me -- please raise your right hand. Please raise your right hand.

A L B E R T  N.  S E D G E S, DEFENDANT SWORN

THE COURT: Okay. That's first thing. Second thing is this. Mr. Sedges, this isn't a general open matter. This is about the tentative order. The tentative order doesn't talk about the CIS at all. The tentative order gave specific reliefs, it denied certain reliefs that were requested by the plaintiff, but it granted certain reliefs by the plaintiff -- for the plaintiff.

Colloquy                                  5

MR. SEDGES:    --

THE COURT:  Okay.

MR. SEDGES:  Okay.  Go ahead.

THE COURT:  But --

MR. SEDGES:  Yeah.

THE COURT:  -- those requests were not based on the CIS.  The granted relief was not based on the CIS.  And I can see you're going down a path here that's not correct.  If you look at paragraph --

MR. SEDGES:    --

THE COURT:  -- 2, 3 and 4, each case, it's based on the law which is status quo in -- in litigation.  Status quo.  The parties are to maintain status quo during --

MR. SEDGES:  Yeah, I -- I see that --

THE COURT:  -- divorce litigation.

MR. SEDGES:  -- yeah, and I need to address that too.

THE COURT:  Well, you have to address that only.

MR. SEDGES:  Well, to be quite frank with you, Judge, is -- I it states right here that I have every right to defend myself in this case to bring up the CIS because you're going on -- you're going on information --

Colloquy                                6

THE COURT:  Mr. Sedges -- Mr. Sedges, respectfully, I'm going to correct you.  You don't have every right to bring up everything that you want to bring up.

MR. SEDGES:  No, no, no, but I'm just saying --

THE COURT:  I've made very clear -- I've made very clear that I did not rule based on the CIS.

MR. SEDGES:  Okay.  So when did you -- if you're not gonna rule on CIS, okay, fine, so I want to make an argument, I don't want to argue with you, but my point is that in my opposition -- did you read my opposition motion?

THE COURT:  I read everything that you had submitted.

MR. SEDGES:  Okay.  I also submitted a -- all right, you're not gonna -- you're not gonna address the CIS, is that correct?

THE COURT:  That is correct, because I -- it wasn't really --

MR. SEDGES:  Okay.  So let's move on -- all right, all right -- you know what, let's move on.

THE COURT:  Yeah.

MR. SEDGES:  Okay?   -- I'll -- I'll argue that at another time.  Now, -- okay, so you're not

Colloquy                          7

gonna --

THE COURT:  And that's fine -- yeah, I want to make sure that you realize you can at another time.  When --

MR. SEDGES:  Right, okay.  But let's -- okay, all right, let's address -- let's address this.

In my -- let me address my motion because this is where I -- I believe that there's a -- there's a -- there's a problem, okay?

In my motion -- and I'm gonna read it to you.  She is -- she has -- we have -- and I submitted to you, I'm pretty sure that I put it down as exhibit A, they're all exhibit As I would imagine, okay.

Is that Carol, just based on the pendente alone, as far as the core reason for it is the spouse who has the income -- the lower earning spouse, the dependent spouse, the financially vulnerable spouse, that's me.  And to bridge the gap on the lower income spouse is not to place the burden on them, and that's what's -- exactly doing.

I -- she makes -- she takes in twice the amount of money I take in.  She also does not tell you that she gets rent from her -- from her granddaughter.  So that's why I said the CIS -- the CIS was important because she's leaving out money

Colloquy                                                    8

that is -- that she's not telling the Court, she's not letting the Court know the money that she's making.  Okay.

And also I get rent also, but I put that in my CIS because I feel as though that look, you should know -- you should have all the information, the financial information for you to make an informed decision.  The -- and I don't believe -- and I'm trying to -- be -- respectful, I'm not saying that you're informed, I'm saying that just based on -- if you just look at the -- the social security, she gets 30,000, I get 18,000.

She has a pension plan, okay, which she states in one of her -- certifications that it's the prenuptial agreement that I'm not allowed to her pension.  That is not true.  That is not true.

THE COURT:  Mr. Sedges -- Mr. Sedges, I'm apologize, but I'm gonna interrupt you again.  You're way, way, way down a path that's not relevant to this order.  What the plaintiff --

MR. SEDGES:  But that's --

THE COURT:  -- what the plaintiff had requested was two things.  The main thing -- the first thing that the plaintiff requested was to -- to sell the property.  To compel you --

Colloquy                                                              9

MR. SEDGES:  Okay.

THE COURT:  -- to sign an agreement, to sell the property.

MR. SEDGES:  Okay, let's --

THE COURT:  Hold on.

MR. SEDGES:  All right.  All right.

THE COURT:  Hold on.  And I denied that.  I denied that.

MR. SEDGES:  Yes, I know -- denied that, but that's --

THE COURT:  Okay.  But what -- what -- what -- the thing is, is that because in part I denied that because it didn't look like it was dire circumstances because there is money to service this mortgage.  That's what it looked like.  There is money to service the mortgage.  That's why I denied it.

MR. SEDGES:  No, there isn't.

THE COURT:  Hold on.  That's why I denied it.  Now --

MR. SEDGES:  --

THE COURT:  -- if you're -- and you were -- Mr. Sedges --

MR. SEDGES:  Let me address

Colloquy                                    10

THE COURT:  Mr. Sedges --

MR. SEDGES:  -- let me address --

THE COURT:  Mr. Sedges --

MR. SEDGES:  -- let address --

THE COURT:  Mr. Sedges, if I'm speaking, you're not.

MR. SEDGES:  Yeah, but I was and you interrupted me before that.

THE COURT:  No.  But -- I -- listen, it's part of my job to do that.  Because I'm the one who has to make the decision.

MR. SEDGES:  Yes.

THE COURT:  I have to keep you on the path of what I need.

MR. SEDGES:  Okay.

THE COURT:  Okay?  So I'm not trying to be --

MR. SEDGES:  Okay.

THE COURT:  -- disrespectful, but I need you to be focussed.  I --

MR. SEDGES:  --

THE COURT:  -- I denied the request to sell the property.  But the property has to be maintained, and it has to be maintained in the status quo.  That the law.

Colloquy                                                11

So --

MR. SEDGES:  Well --

THE COURT:  -- she alleges that you did have an arrangement.  She alleges that you had an arrangement prior to her sending -- her attorney sending you a letter, prior to that --

MR. SEDGES:  Right.

THE COURT:  -- the parties were sharing expenses.  That's the status quo.

MR. SEDGES:  Okay.  Great.  Well, I -- I'll tell you what, I -- I'm -- I'm in agreement with you. Let me put it to you this way.  Plainly and simple. Okay.  I'm in all agreement with status quo.

THE COURT:  Okay.

MR. SEDGES:  Okay.  And they may say, well okay, now all of a sudden he's in agreement, 'cause I figured this would happen.  And I'm prepared for it.

THE COURT:  Okay.  Go ahead.

MR. SEDGES:  There is an emergent circumstance that has developed that you're not aware of, and you probably don't want to even hear that, because it has nothing to do with anything.  My wife has locked me out of the bank account.  She has taken away -- of our vehicles and parked it at her brother's.

Colloquy                                    12

I do a lot of work, I'm a -- I was a general contractor and I would love the status quo. I -- I -- I would -- I would -- Judge, and I'm sorry if I was arguing -- I apologize, this is a little --

THE COURT:  You're fine.  Don't worry, you're fine.

MR. SEDGES:  Okay.  The thing is, I would love status quo.  I -- right here and now we could end this whole thing and I would say, guess what, I'm not gonna argue -- all this other stuff.  I mean, I could, I could, but I'm not gonna waste the Court's time.

If I could say to the Court, if I could say to the Court, status quo would be fine with me.  I have no problem with it.

THE COURT:  Okay, well then let me check --

MR. SEDGES:  --

THE COURT:  -- if she's taking things away from you, that violates status quo.  So let me ask -- let me ask the attorney about that.

So tell me --

MR. SEDGES:  Okay, so -- but I need to finish --

THE COURT:  -- specific -- I heard you say two things.

Colloquy                                          13

MR. SEDGES:  -- I need -- I need to finish.

THE COURT:  Go ahead.

MR. SEDGES:  Please.  If -- I'm very sorry.

THE COURT:  That's all right.

MR. SEDGES:  I'm very sorry, but I need to finish.  These circumstances that have arisen since -- since she's filed the divorce, I had -- I -- like I say, I -- I was a general contractor for years, I had a license, I'm -- I'm a handyman, I'm very good.  It's not that I'm sick, it's not that I can't work, you know, I -- make pretty good money, but I had to put off and refuse her 'cause I can't get there.  Status quo is fine with me.  As a matter of fact, there -- she says -- she states in her statement, in her -- in her response that, well, ever since I -- ever since I served him with divorce papers, he won't pay the mortgage.

Well, I only get 1,435 a month.  The mortgage is 1,135.  I'm left with $300 for the rest of the month to eat.

THE COURT:  Mr. -- Mr. Sedges.  Let me back up to something you were saying.  The status quo, you said you were locked out of bank accounts by the plaintiff?

MR. SEDGES:  Yeah.

Colloquy                                              14

THE COURT:  So -- so these were joint --

MR. DELL'ITALIA:  Your Honor, that's --

THE COURT:  -- joint -- hold on -- hold on, counsel, I'll get to you in a second.  I just want to make sure I understand the allegation.

MR. SEDGES:  Okay --

THE COURT:  So there were -- were there joint bank accounts?  Joint bank accounts?

MR. SEDGES:  No, they're not joint -- Carol and I married for 22 years.  In the 22 years that we were married, okay, we've only had one account.  I didn't even know the name of the mortgage company until two months ago, because she handles the finances.  So this -- and I also have another lawsuit pending in court, that I filed last week, for the malice that she's been putting towards me, and the cruelty, okay, of that malice, to lock me out of the account where I can't have access, I don't have -- I've spent $1,200 so far just in travel expenses, so I can go to the doctor, so I can go get a haircut.  So I can go --

THE COURT:  Okay, but hold on -- hold on.  Let's just stay with the bank.  So there was one back account?

MR. SEDGES:  Sure.

Colloquy                                    15

THE COURT:  One bank account, you're saying?

MR. SEDGES:  Yeah.  Yes.

THE COURT:  And what's the bank?

MR. SEDGES:  The bank -- let me look at the CIS, if you don't mind, I hate to look at that to -- the name, Sir.

THE COURT:  Go ahead.  Go ahead.

MR. SEDGES:  Okay.  Thank you.  I know you don't -- I -- I hope I can do that.

THE COURT:  Yeah.

MR. SEDGES:  Okay.  The bank is Chase.  Chase Bank.  We've had that account, her and I, for years --

THE COURT:  What's the account number?  What's the account number?

MR. SEDGES:  Okay.  Hold on one second please.  Let me -- let me get there.

MR. DELL'ITALIA:  Your Honor --

THE COURT:  Hold on, counsel.  Just a second.  Let him finish, please.

MR. SEDGES:  Let me -- let me -- let me get there.  Okay.  She does not have -- she does not put down --

THE COURT:  Okay.

Colloquy                                              16

MR. SEDGES:  -- an account number --

THE COURT:  All right.  But it's with Chase.  All right.  So let me -- let me ask --

MR. SEDGES:  Yes, and then there's -- an MT -- an M&T Bank, M&T Bank, Sir.  And Chase.

THE COURT:  M&T?  Two banks?

MR. SEDGES:  Yeah, it's called M&T.  Pardon me?

THE COURT:  Chase M&T?

MR. SEDGES:  -- no, like -- M&T --

THE COURT:  Yeah.

MR. SEDGES:  -- Not MTG.  M&T.

THE COURT:  M&T.  Okay.  Let me ask -- let me.ask counsel.  Mr. Dell'Italia, what do you have to say about this?

MR. DELL'ITALIA:  Your Honor, as far as I know, he never used that bank account.  He gave her the money in cash for the mortgage, every month.  Okay.  But if Your Honor wants to put that, you know, he shall have access to any joint bank accounts, I have no problem with that, as long as they're joint.

THE COURT:  Well, do we know -- your -- your client listed this on the CIS.  Does the CIS --

MR. DELL'ITALIA:  Right.

THE COURT:  -- indicate that it's joint, or

Colloquy                                          17

hers?  What does it say?

MR. DELL'ITALIA:  It -- I just looked at the CIS, it does say, joint.

THE COURT:  Okay.

MR. DELL'ITALIA:  And I was just gonna call my client just to confirm.

THE COURT:  Okay.  All right.  So -- so that's fine.  So that's part of status quo, as you know, counsel.

MR. DELL'ITALIA:  Right.

THE COURT:  If it's a joint account, she's gotta give him access.  Okay.  All right.

MR. DELL'ITALIA:  Absolutely.

THE COURT:  Very good.  Thank you for your help.

All right.  Mr. Sedges, what about the car?  You said something about the car?  What's --

MR. SEDGES:  The car -- Your Honor, the car is critical because it gets me -- obviously it keeps me from spending all this money on -- on Uber.  Okay.  And at the same time, I -- work, I'm on social security, Sir.  Disability.  But I can work and I make good money now.  When I say good money, they allow you to make at least $1,680 -- 6 -- $1,620, that's what it is this year.  Okay.  But there's a

Colloquy                                                        18

little bit of a -- I don't know if I'm using the right words -- codicil.

In a five year period you have nine months where you can earn as much as you want, and then, let's say I go to --

THE COURT:  I understand.

MR. SEDGES:  -- you -- okay.  I'm sorry, I don't mean to be --

THE COURT:  Yeah, yeah.  No, no, no, you're fine.  You're fine.

MR. SEDGES:  Okay.

THE COURT:  I just want you to know that I get what you're saying, but let me get back --

MR. SEDGES:  --

THE COURT:  -- let me back -- get back to the car.  So was the car -- is the car a joint car for the parties, and now you --

MR. SEDGES:  No, the car -- the car -- the car, okay, that we have is registered in her name, but it's marital property.  I also, you know, contributed to the car.  See the car's in her name because she has -- she gets a better rate.  You know, as far as the registration is concerned -- insurance --

THE COURT:  Well, let me ask -- okay,

Colloquy                                    19

that's fine.  Let me ask you this.  From a status quo standpoint, if I had asked you six months ago --

MR. SEDGES:  Sure.

THE COURT:  -- if I was talking to you six months ago --

MR. SEDGES:  Right.

THE COURT:  -- who uses the car, for what purpose?

MR. SEDGES:  I used it -- I used the Jeep to do my -- you know, my handyman work.  --

THE COURT:  And -- and who -- who did the shopping for the food?  And went to the store and stuff like that?

MR. SEDGES:  Both.  Carol and I.

THE COURT:  So you both --

MR. SEDGES:  This is --

THE COURT:  -- so -- so -- so you were both using the car, right?  You're both using the car?

MR. SEDGES:  Yes, then we have another car. We have another car.  We have the Chevy Spark.  And the reason we have a Chevy Spark is because the Jeep takes up a lot of gas.  And we have a Chevy Spark, okay, that we purchased years ago.  And, you know, so we would use that, let's say for, we go to BJ's or we go to supermarket, whatever.  But when I go to do my

Colloquy                                           20

jobs, you know, I need the Jeep, because there's bad -- up there, and obviously the Jeep is a much more sturdy vehicle for my tools.  The fact I gotta carry supplies, things at this stage.

THE COURT:  Okay.  So let me ask you this then --

MR. SEDGES:  Sure.

THE COURT:  -- if -- are you -- first off, let's take the easy question --

MR. SEDGES:  Sure.

THE COURT:  You're -- you're not concerned about using the Chevy Spark, is that correct?

MR. SEDGES:  No, not at all.

THE COURT:  Okay.  So then, with the Jeep, is -- is Ms. Sedges pro -- prohibiting you from using the Jeep?

MR. SEDGES:  She's taken the -- the -- she -- she took -- I got the date right here.  When I got the letter from Mr. Dell'Italia, okay, I got -- it was written -- here it is, it's right in front of me.  It was written on the 5th of February.  I got it in the mail on the 7th.  I was stunned because I was getting sued, you know, for divorce, over $300.  $300.  Imagine that.

THE COURT:  But what --

Colloquy                                    21

MR. SEDGES: So -- I -- Carol --

THE COURT:  -- but what happened with the car?  What happened with the Jeep?

MR. SEDGES:  Well, -- well, here's what happened.  I said, Carol, are you kidding me?  What the hell -- is this all about?  Excuse my French. Okay.  I'm suing you, blah, blah, blah.  Okay.  I come out of my -- I come out of my house, I see her brother pull up in his Cadillac.  And I see her get -- I said, where's the -- where's the Jeep?

Oh, oh, oh, I'm getting it fixed.  I said, you're getting it fixed.

THE COURT:  All right.  Mr. Sedges, you're gonna have to roll this forward.  Where's the Jeep?

MR. SEDGES:  Okay.  -- okay, real quick. Okay.  I'm sorry, I thought you wanted some detail. All right.  She gets out of the car, where's the car? It's getting fixed.  Getting fixed?  Who's fixing it?

THE COURT:  Where is it now?

MR. SEDGES:  It's at -- it's at her brother's house.

THE COURT:  All right.  Mr. -- Mr. Dell'Italia, what do you know about the Jeep?

MR. DELL'ITALIA:  Your Honor, I will get that -- I will get that car back.  You have my word.

Colloquy                                    22

I --

THE COURT:  Okay.

MR. DELL'ITALIA:  -- it's listed as a joint asset.  I did not know that she did that.  If she did do it.  You know.  But I will get that car back.

THE COURT:  Okay.  All right.  So what I'm gonna do, Mr. Sedges, then --

MR. SEDGES:  Yes, Sir.

THE COURT:  -- I'm -- I'm just going to modify the tentative order to capture the two things that Mr. Dell'Italia said.

MR. SEDGES:  Yes, Sir.

THE COURT:  One, is that you will have access to the Chase account.  Number one.

MR. SEDGES:  -- joint.

THE COURT:  Number -- which is a --  which is a joint account.  And number two, you will have use to the Jeep as you had as part of status quo.  You're gonna have both those things back, okay?

MR. SEDGES:  Great.  And great.  And guess what, that would be wonderful, because I do have a couple of big jobs coming up.

THE COURT:  There you go.

MR. SEDGES:  -- make money.  Listen, I know $1,000 -- I know $1,600 to guys like you and Mr.

Colloquy                                    23

Dell'Italia, it's not a lot of money, but --

THE COURT:  Not true.

MR. SEDGES:  --

THE COURT:  Don't think that.  Don't think that.  Okay.

MR. SEDGES:  Why?

THE COURT:  No.  Because -- if you don't think that it means anything to me, give me your 1,600, I'll gladly take it.

MR. SEDGES:  No, no, no, I didn't mean it that way, I didn't mean to be disrespectful --

THE COURT:  All right.  No, no, I don't think you are.  I'm trying to show you that I look at $5; $10, $20 --

MR. SEDGES:  Oh --

THE COURT:  -- $50.  Okay.

MR. SEDGES:  Okay.  Okay.  All right.  Okay.  Okay.  All right.

THE COURT:  All right.

MR. SEDGES:  -- I thought it may have sound silly.

THE COURT:  It doesn't sound silly at all.  It's about status quo.

MR. SEDGES:  Okay.

THE COURT:  It's about how the parties were

Colloquy                                          24

behaving before.  It doesn't really matter.

MR. SEDGES:  Right.

THE COURT:  Doesn't really matter if it's $5.

MR. SEDGES:  Right.  Yes.

THE COURT:  Doesn't matter.  Okay.

MR. SEDGES:  And I'm gonna tell you another thing.  She did not get -- can I say something?

THE COURT:  Go ahead.

MR. SEDGES:  She did not get -- she did not get the money for -- I'm gonna be honest.  She didn't get the money for March, and she didn't get it for April, the -- the mortgage.  And I have receipts, just so you know, I have receipts, I didn't take the money and go, you know, pissing it away.  Okay.  We needed -- we needed a new dryer.  We have a family full of five people.  I got my grandson, my great-grandson, I got my granddaughter, I got my wife, I got my sister, we've all -- so we needed a dryer, she wouldn't pay for it, or she wouldn't help pay for it. I paid for it, I got a receipt right here.  $800.

The tenant downstairs needs a dishwasher, needed a stove.  The dishwasher was $1,100.  Okay. My expenses for travelling are about $1,000.  Now, we needed -- she needed the stove that was $300 --

Colloquy                                          25

THE COURT: All right. Hold on. Hold on. Just -- hold on. Mr. Dell'Italia, how much under the order is owed? We have --

MR. DELL'ITALIA: In mortgage payments, it's $4,472.38.

THE COURT: $4,472 --

MR. DELL'ITALIA: and 38 cents.

THE COURT: And that's for how many months?

MR. DELL'ITALIA: That's for the June of 2024 --

THE COURT: Yeah.

MR. DELL'ITALIA: -- pursuant to the order, and February, March and April mortgage. The mortgage amount is $1,112.46.

THE COURT: So it's for four months.

MR. DELL'ITALIA: --

THE COURT: For four months.

MR. DELL'ITALIA: That's -- that's right.

THE COURT: Okay.

MR. DELL'ITALIA: For the -- the water, sewer and garbage is $338.

THE COURT: Hold on.

MR. DELL'ITALIA: That's what's --

THE COURT: Hold on. Okay. Mr. Sedges --

MR. SEDGES: Yes.

Colloquy                                        26

THE COURT:  -- I need you to really, really focus now.

MR. SEDGES:  I will focus, yes, yes.

THE COURT:  -- you're a business person, I'm asking you a very, very simple question.

MR. SEDGES:  Yes, Sir, I will -- I'm sorry.

THE COURT:  How much time do you need to catch up on these two amounts?  The 4,472 and 338?

MR. SEDGES:  How much time would I need?  I would say -- depending on how the work comes in -- I don't know, I think I would need at least six months --

THE COURT:  All right.  You're gonna -- you're gonna have to tighten that up a little bit.

MR. SEDGES:  Okay.

THE COURT:  How about three?  How about three?

MR. SEDGES:  Three -- okay, I said three, you said there, so there's a little karma there.

THE COURT:  Okay.  All right.  Mr. Dell'Italia, I'm gonna put that in the order that he'll pay these amounts within 90 days from the date of this order.

MR. DELL'ITALIA:  Okay.  But -- buy the May payment going --

Colloquy                                          27

THE COURT: Oh, yeah, the May he has to pay on time. I'm talking about the arrearage.

MR. DELL'ITALIA: Right.

THE COURT: And everything else, Mr. Sedges, is status quo. Means, that when the May mortgage comes up, you gotta -- you gotta pay that bill. Okay.

MR. SEDGES: Yeah, sure. --

THE COURT: Okay. All right.

MR. SEDGES: -- you know, Judge -- you know, Judge, if I -- and I hate -- and I hate to keep on saying it, but I'm excited in the sense that when I have my work and I have my jobs I can do pretty -- I can do pretty well.

THE COURT: I suspect that that's the case. That's why I'm --

MR. SEDGES: Yes.

THE COURT: -- glad to get -- I'm glad you're gonna get -- you're gonna get your Jeep back.

MR. SEDGES: Yeah, that's be great.

THE COURT: Now, -- and Mr. Dell'Italia, I'd like to have that taken care of today.

MR. DELL'ITALIA: Yeah, I'm gonna call my client as soon as I get off -- I was ready to call her while we were talking, Your Honor, because I as -

Colloquy                                  28

- like I said, nobody told me.

THE COURT:  Okay.  I understand.  That's fine.  Listen --

MR. SEDGES:  -- can I say something -- can I say something to Mr. Dell'Italia's defense.

THE COURT:  Yeah, go ahead.

MR. SEDGES:  Carol's not -- liar, but she likes to leave you important issues, and I -- and I know when I was going to school, and the little bit of law that I have under my belt, is the first class the professor said, listen, you and your lawyer need to breathe out of the same lung.  If you're not breathing out of the same lung sometimes when the lawyer gets to court they'll turn to their client and go, hey, what the hell is this.

And so Carol isn't a liar, but she'll not give you the full boat.

THE COURT:  All right.

MR. DELL'ITALIA:  -- Mr. Sedges for helping me out.  Your Honor, with your permission, I have no problem with your order.  I'm on trial up in Sussex --

THE COURT:  Go.

MR. DELL'ITALIA:  -- as you know, it's tough --

Colloquy                                        29

THE COURT:  And -- and --

MR. DELL'ITALIA:  -- tough as heck to get up there.

THE COURT:  -- I'm --

MR. DELL'ITALIA:  With that sinkhole.

THE COURT:  -- I understand.  Go, go. We're finished for today.  I have another matter I'm ten minutes late for.  So I have to get going to.

We're all set.  I'll get the order out today.  -- the parties know what they're supposed to do.  They know it right now.

MR. DELL'ITALIA:  And I'm gonna call my client right away.

THE COURT:  Okay.  Thank you very much. Have a good rest of the day, both of you.

MR. SEDGES:  All right.  Thank you, Sir.

THE COURT:  Thank you.

MR. SEDGES:  All right.  Thank you.


(Hearing concluded)

30

Certification

I, Deborah Hashimoto, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CourtSmart, time stamp 8:44:08 to 9:10:29, is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings as recorded.

/S /Deborah Hashimoto                    Date: 3-7-2026

Deborah Hashimoto #631

_____          _____
KING TRANSCRIPTION SERVICES              Date
3 South Corporate Drive Suite 203
Riverdale, New Jersey 07457
(973)237-6080

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION/FAMILY PART
MORRIS COUNTY
DOCKET NO.:  FM-14-773-25
A.D. #

CAROL ANN SEDGES,        )
                        )            TRANSCRIPT
        Plaintiff,  )              OF
                        )     MOTION HEARING
   vs.              )
                        )
ALBERT SEDGES,        )
                        )
       Defendant.  )
------------------------

             Place:  County Courthouse
                    Washington and Court Streets
                    Morristown, New Jersey 07963
                    (HEARD VIA ZOOM)

             Date:  June 13, 2025
BEFORE:

   HONORABLE MARTIN F. BARBATO, J.S.C.

TRANSCRIPT ORDERED BY:

   ALBERT SEDGES
   201 South Rogers Road Bldg. I Apt. 130
   Hot Springs, AR 71901

APPEARANCES:

   JOHN P. DELL'ITALIA, ESQ., (Dell'Italia &
   Santola)
   Attorney for Plaintiff, Carol Ann Sedges

   ALBERT SEDGES, PRO SE
   For Defendant, Albert Sedges

             Deborah Hashimoto
             KING TRANSCRIPTION SERVICES, LLC
             3 South Corporate Drive Suite 203
             Riverdale, New Jersey 07457

             Audio Recorded
             Recording Opr. Elsa Hernandez

2

I N D E X

| PROCEEDING | PAGE |
|---|---|
| Motion hearing | 3 |
| Arguments | |
| By Mr. Dell'Italia | 9 |
| By Mr. Sedges | 10 |

Colloquy                                              3

THE COURT:  -- I'm sorry, Ms. Sedges, I don't know why your attorney isn't here, but nevertheless, I think, as I said, for different reasons --

PLAINTIFF:  Excuse me, Your Honor.  Would you like me to get -- have his secretary come and let you know what the situation is with him?  To --  you know, be at -- at this hearing --

THE COURT:  Sure.  Sure.  Sure.

PLAINTIFF:  Okay.  Thank you, Sir.

MR. SEDGES:  Your Honor.  Your Honor?

THE COURT:  Yes.

MR. SEDGES:  This is Mr. Sedges, Sir.  Good afternoon, Sir.  I just wanted to say while my wife is gone that -- before we start, I don't want to be rude, and certainly don't want to upset anybody.  I -- I -- I'm not a trained attorney, but it's my understanding that The Court should know immediately of any significant changes in circumstances --

THE COURT:  No, Mr. -- Mr. Sedges, what you can't do is exactly what you're trying to do, which is to talk to me --

MR. SEDGES:  Okay.  Very good.  Okay.

THE COURT:  -- without the other party here.

Colloquy                                               4

MR. SEDGES:  Yes, Sir.

THE COURT:  Okay, it's unfair.  It's unfair.

MR. SEDGES:  Yes, Sir.  Yes, Sir.  I got you.  I got you.  Okay.  I'm sorry.  I just didn't know and that's why I was trying to be very --

THE COURT:  No, that's fine.

MR. SEDGES:  -- you know, cautious.  I apologize.  I apologize, Sir.

THE COURT:  You don't have to apologize, you're okay.

MR. SEDGES:  All right.  Thank you, Sir. I appreciate it.

UNIDENTIFIED FEMALE:  Your Honor?

THE COURT:  Yes.

UNIDENTIFIED FEMALE:  We're reaching out to Mr. Dell'Italia right now.  We're trying to get him on his cell phone, can you give me a minute?

THE COURT:  Just a minute or two, I want to get started.  I have something at 2:00, so I gotta get this -- we gotta get to this.

UNIDENTIFIED FEMALE: I fully understand.

THE COURT:  Okay.  Thank you.

UNIDENTIFIED FEMALE:  I fully understand. Thank you.  Just give me one minute.  Thank you.

Colloquy                                                5

THE COURT:  All right.  Thanks.

(Pause in proceeding)

UNIDENTIFIED FEMALE:  I'm sorry, Your Honor?

THE COURT:  Yes.

UNIDENTIFIED FEMALE:  Mr. Dell'Italia is having a problem logging in, he's doing it right now.

THE COURT:  Okay.  Thank you.

UNIDENTIFIED FEMALE:  Thank you.

(Pause in proceeding)

(Recording paused)

(Recording resumed)

MR. DELL'ITALIA:  Your Honor, I had a little trouble signing in.

THE COURT:  No worries.  I'll take appearance please, counsel.

MR. DELL'ITALIA:  John P. Dell'Italia, Dell'Italia and Santola, appearing for Carol Sedges.

THE COURT:  Okay.  All right.  Thank you. And the record will reflect that the -- everyone is appearing virtually.  The parties are appearing virtually and the defendant is self represented.

Okay.  So I think that we can make this rather short for the following reason.

So I went back and looked at my notes when

Colloquy                                                                6

I first -- I had given an tentative order in this matter. We had a call on April 23rd, 2025, and my notes indicate that Ms. Sedges, you did not participate in that call. But --

PLAINTIFF:  That's correct, Your Honor.

THE COURT:  -- Mr. Dell'Italia did and Mr. Sedges did.

Now, in that call, Mr. Sedges raises something that wasn't in the motion that was before me that day. He raised about access to bank accounts which was not part of the motion and he raised about the use of a car.

Mr. Dell'Italia offered that he didn't oppose Mr. Sedges having access to the accounts. And so that's the only reason why that was put in the order. And he offered that the Jeep would be returned. And I think Mr. Dell'Italia, in fairness to him, was acting under the basis of believing and thinking that we were talking about marital assets. If it was a joint account, or a vehicle that was within the marital state, that was jointly held and used by the parties, status quo in a matrimonial matter would necessitate that those items not be unilaterally taken possession of by one party.

And so acting on that law, Mr. Dell'Italia

Colloquy                    7

had -- and I have it in my notes, didn't oppose the defendant's access to what we -- was presented as joint accounts and didn't oppose the Jeep. In fact, my notes say, the Jeep was gonna be returned to Mr. Sedges as if it was his.

But neither one of those things were in the original motion. And so for that reason I would remove them from the order. I would remove them from the order, and it would be as if nothing happened with regard to those matters.

Now, where would that leave the parties? Status quo. There's a dispute here between the parties as to what's status quo.

Mr. Sedges raised these two subjects at the motion hearing on April 23rd, representing that they were essentially -- status quo was, he had access to these account -- to the bank accounts and that he was using the car for jobs, the Jeep, specifically the Jeep for jobs.

I also wrote down about the Chevy Spark, but I might have just written that down as another vehicle.

So in any event, whatever the parties have been doing to this point, and up to the point of the filing of the complaint, that's what they're supposed

Colloquy                                                                 8

to be continuing to do.

So if it were that Mr. Sedges was using, prior to the filing of the complaint, was using the Jeep in the context of his business, then he should be able to continue to do that.

And if it were that he was having access to bank accounts, then that should be continued as well.

But it seems that based on the submissions of the parties, that's really disputed. But it's not procedurally before The Court in this time. It was added, added to the order because it sounded like the parties had agreement on it. And apparently they don't.

So it was Mr. D'Italia's -- Dell'Italia's motion first for reconsideration, I'll hear from you first and then I'll hear from Mr. Sedges.

MR. SEDGES:  Yes, Your Honor --

THE COURT:  No, Mr. -- Mr. Sedges --

MR. SEDGES:  I'm sorry.

THE COURT:  -- I said, Mr. Dell'Italia first, then I'll hear from you.

MR. SEDGES:  Okay.  But I have a different understanding of --

THE COURT:  I said, I'll hear from Mr. Dell'Italia first and then I'll hear from you.

Argument - Dell'Italia                    9

MR. SEDGES:  Yes, Sir.

THE COURT:  Okay.  Go ahead, Mr. Dell'Italia.

MR. SEDGES:  I'm sorry, go ahead.

MR. DELL'ITALIA:  Yes, Your Honor.  Oh, can you hear me, Your Honor?

THE COURT:  Yes.

MR. DELL'ITALIA:  Oh, okay.  Yes, Your Honor.  You're absolutely correct.  At the time, my client was not present at the hearing because she had a doctor's appointment that she couldn't cancel. When Mr. Sedges brought those two matters up, it hit me by surprise because I didn't -- you know, there were no papers submitted.

I subsequently, after speaking to my client, then after the hearing, found out that those two accounts had been my client's accounts from day one of the union.  And they really were never, you know, shared accounts.

As to the vehicle, it was purchased by my client and solely used by my client.

Curiously enough, you know, as to Mr. Sedges' allegations regarding that he used the vehicle for work --

THE COURT:  Well, I don't want to go down

Argument - Sedges                    10

that path yet.

MR. DELL'ITALIA:  --

THE COURT:  Let's not go down that path. You acknowledge --

MR. DELL'ITALIA:  Okay.  All right.

THE COURT:  -- you acknowledge that this was outside the scope of the original motion that was filed on March 4, 2025.

MR. DELL'ITALIA:  That's absolutely correct, Your Honor.

THE COURT:  Okay.  All right.  Now, Mr. Sedges, I have to swear you in first, so --

MR. SEDGES:  Sure.

A L B E R T   S E D G E S, DEFENDANT SWORN

THE COURT:  Okay.  You may put your hand down.  Then for the record, please, state your full name, spell your last name.

DEFENDANT:  Full name is Albert, A-L-B-E-R-T.  Last name Sedges, S-E-D-G-E-S.

THE COURT:  Okay.  All right.  You may proceed.

MR. SEDGES:  Okay.  I -- I need to continue this way.  It's my understanding that The Court needs to know and should know immediately that there -- that there has been any significant change in

circumstances, and I have urgent information for The Court regarding significant and unforeseen change in circumstances that occurred within the last 24 hours which profoundly impacts the immediate health of the defendant and financial situation and I would like to explain it to The Court so you have the full breath and context of what has happened.

THE COURT:  Okay.  Well, before you do that, Mr. Sedges, I'm gonna explain to you, I'm gonna try to explain to you --

MR. SEDGES:  Yes.

THE COURT:  -- why procedurally that is not something to be heard today.  Okay.  The Court has to work within a box, okay?

MR. SEDGES:  Okay.

THE COURT:  The parties present the -- they file a complaint.  Between the complaint and the end is the judgment.

MR. SEDGES:  Uh-huh.

THE COURT:  At the end is a trial, unless the parties settle, and in between there's like -- that's like the whole war.

MR. SEDGES:  Okay.

THE COURT:  In between like little battles, motions.

Argument - Sedges                                    12

MR. SEDGES:  I got you.

THE COURT:  Okay?

MR. SEDGES:  Okay.  Well, this -- okay, I won't -- I won't -- obviously I can't go forward, 'cause you told me not to and I won't, so I'll -- I'll go on your direction.

So, okay, as far as the vehicle -- I can speak on the vehicle, is that okay?

THE COURT:  No.  No it isn't.

MR. SEDGES:  No?  Okay.

THE COURT:  That's why I wanted to explain to you.

MR. SEDGES:  Okay.  Go ahead.

THE COURT:  Let me try this again.

MR. SEDGES:  Yes.  Yes.

THE COURT:  Because it's a little battle, the battles have like little rules around them.

MR. SEDGES:  Okay.

THE COURT:  They have box.  Okay?

MR. SEDGES:  All right.

THE COURT:  And the box is the piece of paper that Mr. Dell'Italia filed, which was called the notice of motion.  Right?

MR. SEDGES:  Right.  -- .

THE COURT:  In the notice of motion he gets

Argument - Sedges                    13

the right to ask The Court to give him a decision --

MR. SEDGES:  Right.  Right.

THE COURT:  -- on everything in the notice.

MR. SEDGES:  Sure.

THE COURT:  Nothing more.  Nothing less.

MR. SEDGES:  Sure.

THE COURT:  So in that notice, the first thing he had was, compelling the defendant to sign a listing agreement for sale of the marital residence.

MR. SEDGES:  Right.

THE COURT:  The next one was, compelling the defendant to reimburse for half of the June 24 mortgage, the February 2025 mortgage, and any future mortgage payments that are paid up.  Number three was, compelling the defendant to pay half the mortgage.

Number four, compelling the defendant to pay one half the sewer, water and garbage bills.  And the full amount of the cable --

MR. SEDGES:  Right.  Right.

THE COURT:  -- and electric.  Number five, compelling the defendant to pay Home Depot.  Number six, compelling defendant to pay half the account's fee.

MR. SEDGES:  I got it.

Argument - Sedges                                14

THE COURT:  Number seven, pay attorney's fees.  Right.

MR. SEDGES:  Right --

THE COURT:  What's not in here --

MR. SEDGES:  Okay.  Very good, so --

THE COURT:  -- what is not in that list is the car or bank accounts.

MR. SEDGES:  Okay.  That's fine.  I brought that up the last time when we had the Zoom, okay, because it makes absolutely no sense, okay, if you look at it my way, when she filed for -- she filed for a divorce on February 11th.  The car is gone, it's been gone for four or five months now.  I've always used a car.  How in the world can I possibly afford to live where I live, go through all those expenses that you just put down that I have to pay in that -- like you say, in that little war, that little -- that little motion there, okay, in that motion you're asking me to make all these payments on $1,465 a month on a social security disability check.  I'm a disabled person.  I have a disability.  And that's what I wanted to speak about.  I re-injured myself and I cannot work.

THE COURT:  So, Mr. Sedges, this is another part of the battles, okay?

MR. SEDGES:  Right.

THE COURT:  The -- you didn't file a motion for re --

MR. SEDGES:  I mean you gave -- excuse me -- excuse me -- you gave the order -- you gave the order to return the vehicle, get the access to the account --

THE COURT:  No, I understand --

MR. SEDGES:  -- and she's --

THE COURT:  -- but Mr. Sedges --

MR. SEDGES:  -- and she's not --

THE COURT:  -- I mistakenly did that.  I mistakenly did that because I did that on you bringing up something that wasn't in the motion and the only reason I included it, as I said, is because Mr. Dell'Italia agreed.  It seemed that the parties had agreement.

MR. SEDGES:  Okay.  But --

THE COURT:  That's the only reason it was there.  Okay?

MR. SEDGES:  Well, I'm just trying to use -- I'm just trying to use common sense at this point. I mean, if you look at it, okay?

THE COURT:  No, Mr. Sedges --

MR. SEDGES:  I mean, I have --

THE COURT:  -- no, Mr. Sedges, you're gonna have to stay within this process.

MR. SEDGES:  All right.  Very good.

THE COURT:  I've already said -- I said to both the parties, I'm making very clear to both the parties, is that whatever -- whatever was the status quo, when this complaint --

MR. SEDGES:  Right.  Yeah.

THE COURT:  -- hold on.  Whatever the status quo was when the complaint was filed, the parties are supposed to follow it.

So let's say, for instance, you're exactly right, when the complaint was filed, you had been using the Jeep.  You can bring a motion to compel Ms. Sedges to allow you to continue to use the Jeep in your business.

And your argument would be, well, that's the way it was before she filed the complaint for divorce.  Or -- right?  That's your contention.

MR. SEDGES:  --

THE COURT:  But I don't have that before me.  I don't have that motion before me.  All right.

MR. SEDGES:  Well, if Ms. Sedges -- excuse me -- but Mrs. Sedges, okay, wants to continue to live in the lifestyle that she is accustomed to, how

Argument - Sedges                                           17

is that gonna be done, my -- my mortgage is 1,135.

That leaves me $335 for the month to eat.

THE COURT:  Mr. Sedges --

MR. SEDGES:  To pay the electric -- to pay

the --

THE COURT:  -- Mr. Sedges --

MR. SEDGES:  Yes.

THE COURT:  -- you can have that logical

argument with Mr. Dell'Italia.  You can have that

argument with him.  No one prevents you from doing

that.  Okay?  And I think that you made that argument

back in April and I think that's why Mr. Dell'Italia

was like, well, that makes sense, let me get you the

Jeep.

I wrote my notes, he said -- returned that

day.

MR. SEDGES:  Right.

THE COURT:  So what I'm saying is, is that

you should have the conversation with him, the one

that you're trying to have now, the one you had on

April 23rd, and see if you can reach an agreement on

it.  If not, you have to bring your own motion to

request it.

MR. SEDGES:  Oh, then I will.

THE COURT:  Because you didn't come here on

Colloquy                                                    18

a motion.

MR. SEDGES:  Okay.  Well, I did have -- I did file, okay, a  reply certification, did you get that?

THE COURT:  I did, but that --  the reply that has anything to do with the car or the bank accounts is not really a reply because it wasn't in the original motion.

MR. SEDGES:  Okay.  All right.  Listen, I do understand what you're saying now.  I was not trying to, obviously, give you a hard time --

THE COURT:  I don't think you are.

MR. SEDGES:  -- that was the last thing -- oh, okay, good.  The last thing I want to do is give you a hard time.

So, okay.  I will try to work with Mr. Dell'Italia.  I will -- if that doesn't work out, I will -- I will file a motion, like you say, with The Court.  I've been -- I've been handling most of this on my own, unfortunately, I don't have any money. I've been doing this mostly on my own.  And I'm not a trained attorney so it's kind of frustrating for The Court, I'm sure, in that regard.

So I'm gonna have to re-investigate this matter, for myself, to file this motion of the car --

Colloquy                                    19

THE COURT:  And the accounts.

MR. SEDGES:  -- and the accounts.  So I'm gonna -- I'm going to -- what -- what kind of motion would that be, or I'll just have to look it up, I guess.

THE COURT:  Well, yeah.  It's -- it's similar to what they did.  They did it -- you will have to look it up, but I will tell you this --

MR. SEDGES:  Okay.  All right.

THE COURT:  -- you can come -- there is an ombudsman, a service center in Morris county --

MR. SEDGES:  I'm there almost --

THE COURT:  -- where they help people.

MR. SEDGES:  -- I'm there almost -- I'm there almost every day.  I was there three days this week.  I did the emergent ruling --

THE COURT:  Ask -- well, then you can ask somebody there.  They'll help you.

MR. SEDGES:  I'm going to -- no, no, no, I'm going to.  I didn't mean it like that.  I wasn't trying to be, you know, pejorative, I'm sorry.

I meant it like, in other words, -- room 105.  That's the room you go to.

THE COURT:  Okay.  So you know.

MR. SEDGES:  You know, so --

Colloquy                                          20

THE COURT:  Okay.

MR. SEDGES:  -- oh, yeah, no, I know, so I will end up going there.  I can't go tomorrow, tomorrow's Saturday, but I will end up going there on Monday.  Okay.  On Monday, and I will ask them, what kind of motion can I file because the judge has let me know that I need to do the car, and I need to do --

THE COURT:  Well, I'll tell -- I'll tell you what it's gonna be styled.  It'll be a notice of motion for exactly what they said.  Pendente lite relief means, relief during the litigation.  That's what it is.

MR. SEDGES:  Okay.  So, then I --

THE COURT:  So your relief is, you want the status quo.  You're gonna have to show that the status quo was that you were using the Jeep for work when the complaint was filed.

MR. SEDGES:  All right.  So let me just write this down.  I'm going to file for pendente lite -- pendente lite motion --

THE COURT:  Right.

MR. SEDGES:  -- basically.

THE COURT:  Yup.

MR. SEDGES:  Okay.  I'll go Monday.  I'll

Colloquy                                          21

file for pendente lite motion.  I'll get all my information, I'll put it in there, that I was --

THE COURT:  But --

MR. SEDGES:  -- that it was status -- that it was status quo and I'll give all the evidence and documentation on how I can back that up.

THE COURT:  But what you -- that's fine, but I will tell you this, is that now, Mr. Dell'Italia has heard this, he hears that this is coming, you may want to have a conversation with him first to see what you can figure out.

MR. SEDGES:  I know, I do.  No, I do want to have a conversation with him first, but if the conversation goes nowhere then I have to go to room 105.

THE COURT:  I -- I agree with that.  I agree with that.

MR. SEDGES:  Okay.  All right.

THE COURT:  All right.  So --

MR. DELL'ITALIA:  Your Honor?

THE COURT:  Yes, go ahead.

MR. DELL'ITALIA:  I'm sorry.  The only thing I asked that in the meantime, Mr. Sedges has not made any mortgage payment whatsoever.

THE COURT:  Then you can file an action.  I

Colloquy                                                  22

already -- I already gave you relief.  I gave you an order.  You know what you can do next, counsel.

MR. DELL'ITALIA:  Okay.  No, no problem, Your Honor.  No problem --

THE COURT:  Listen, and I'm not trying to -- listen, you know what I don't have the power to do is just tell everybody hold on, let me go get a Sheriff's officer, and I'm gonna send the Sheriff's officer to his house and arrest him because he didn't make that payment.  Okay.

MR. DELL'ITALIA:  Okay.  No, you're --

THE COURT:  I hear what you're saying.  Okay.  All right.  I think we're set for today.  We're gonna give a corrected order that removes those two aspects, everything else stays the same.

MR. SEDGES:  Can I -- may say one more thing --

THE COURT:  Yes, go ahead.

MR. SEDGES:  -- and I guess -- I'm -- I'm addressing it to Mr. Dell'Italia.  In regards -- I don't know if this is proper or not -- decorum, but is he willing to discuss anything with me or he just --

THE COURT:  He -- he -- he needs to, he knows.

Colloquy                                    23

MR. DELL'ITALIA:  I am obligated.  And --
Your Honor, I know the rules of professional conduct.

THE COURT:  I know you do.

MR. DELL'ITALIA:  I'm obligated.  Mr. Sedges has had ample opportunity to send me emails regarding this case and has exercised that opportunity.

THE COURT:  Okay.  So, Mr. Sedges, that's your answer --

MR. SEDGES:  There you go.

THE COURT:  -- he's obligated.  He's obligated --

MR. SEDGES:  Okay.

THE COURT:  -- to have a conversation.  Okay?

MR. SEDGES:  Okay.

THE COURT:  All right.

MR. SEDGES:  That sounds -- that sounds fair to me.

THE COURT:  All right.

MR. SEDGES:  All right.  Thank you, Your Honor.

THE COURT:  You're very welcome.  Have a good rest of the day and a nice weekend.

MR. SEDGES:  All right.  Thank you.  Good-

Colloquy                                    24

bye.  You too.  Have a good weekend.

THE COURT:  --

MR. DELL'ITALIA:  Again, I apologize for the last sign in --

THE COURT:  You're fine.  No worries.
Thank you.


(Hearing concluded)

25

Certification

I, Deborah Hashimoto, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CourtSmart, time stamp 1:34:42 to 1:59:28, is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings as recorded.

/S /Deborah Hashimoto          Date: 3-8-2026

Deborah Hashimoto #631

_____          _____
KING TRANSCRIPTION SERVICES          Date
3 South Corporate Drive Suite 203
Riverdale, New Jersey 07457
(973)237-6080

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION/FAMILY PART
MORRIS COUNTY
DOCKET NO.:  FM-14-773-25
A.D. #

CAROL ANN SEDGES,                )
                                 )              TRANSCRIPT
             Plaintiff,          )                  OF
                                 )              HEARING
        vs.                      )
                                 )
ALBERT SEDGES,                   )
                                 )
             Defendant.          )
----------------------------------

              Place:   County Courthouse
                       Washington and Court Streets
                       Morristown, New Jersey 07963
                       (HEARD VIA ZOOM)

              Date:    September 12, 2025

BEFORE:

    HONORABLE MARTIN F. BARBATO, J.S.C.

TRANSCRIPT ORDERED BY:

    ALBERT SEDGES
    201 South Rogers Road Bldg. I Apt. 130
    Hot Springs, AR 71901


APPEARANCES:

    JOHN P. DELL'ITALIA, ESQ., (Dell'Italia &
    Santola)
    Attorney for Plaintiff, Carol Ann Sedges

    ALBERT SEDGES, PRO SE
    For Defendant

                 Deborah Hashimoto
                 KING TRANSCRIPTION SERVICES, LLC
                 3 South Corporate Drive Suite 203
                 Riverdale, New Jersey 07457

                 Audio Recorded
                 Recording Opr. Elsa Hernandez

2

I N D E X

PROCEEDING                                    PAGE

Hearing                                         3

Colloquy                                      3

THE COURT: -- Sedges v. Sedges. Docket number FM-14-773-25. I'll take appearance of counsel first, please.

You're on mute.

MR. DELL'ITALIA: John P. Dell'Italia, Dell'Italia and Santola, appearing for Ms. Sedges, who I have in my office, Your Honor.

THE COURT: Okay. Thank you. All right. The record will reflect that counsel and the two parties are appearing virtually, and that the defendant is self represented.

All right. We have actually three motions here. I'm gonna give you some feedback on the motions first, and then I'll hear from the parties.

The first one was actually filed on June 18th, 2025 by the defendant. Essentially requesting judgment declaring the pre-martial agreement, dated October 16th, 2005 -- 2003, to be -- null, void and unenforceable.

I don't really need to hear anything on this. I'm gonna deny this without prejudice. There's no way that such a decision can be done on the papers. This will have to be at a hearing. Testimony, documentation and it either be as a plenary hearing, which is just the subject, just on

Colloquy 4

the pre-marital, or it would be considered in the context of the overall trial.

Now, that's the only thing I would hear procedurally, from the parties is, which makes more sense to do? To have a plenary hearing separate from the trial, or to hold this subject until the time of the trial, or if the parties agree, you know, to resolve the differences in totality. But what I'm not gonna do is to do that on the papers.

Now, this leads to the motion that was filed by the plaintiff on August 6th, 2025, that was to enforce a prior court order. That was an order that the Court entered here, which was generally speaking that -- and I was just looking at it again. The Court had issued an order -- well, the motion makes reference to a motion -- I don't know why it says April 23rd, 2025, but I think what it's looking to do is to enforce the June 14th, 2025 order, which required the -- the payment of -- amounts to be -- by the defendant, continuing the status quo between the parties, of both contributing to the mortgage and the utilities.

Now, in connection with that order, June 13th, 2025, the plaintiff had said, had made a request for the defendant to sign a listing agreement for the

Colloquy                     5

sale of a marital residence, and that was denied.

I said that the plaintiff has not submitted sufficient proof indicating that the parties are in such dire financial circumstances as to warrant a sale, and then the next relief -- next request was, plaintiff's request to reimburse for half of the June 2024 mortgage payment, the February 2025 mortgage payment and any future mortgage payments that are to be paid up until the hearing an application, that was granted.

And I said, the parties were to continue the -- the status quo. That continued for -- as to the sewer, the garbage, the water bills. Everything else was denied.

So essentially, there was supposed to be a maintaining of the status quo where both parties are contributing to the schedule A expenses, as they call it. All right.

Now, this current motion is to enforce that prior order. So I dealt with this subject already. So -- and the -- Mr. Sedges appears to be essentially making a motion to reconsider that motion, which would be way out -- that order, way out of time. So I'm gonna hear from -- because we have these three motions. When I finish what I'm saying, I want to

Colloquy                                                6

hear from Mr. Dell'Italia, about where we are economically with these parties.  Because I'm wondering if -- if this is -- ongoing problem, then maybe I have to revisit my June 2025 order, and then grant the ability to sell the house.

But before I get there --

MR. DELL'ITALIA:  --

THE COURT:  -- before I get there -- hold on.  Hold on.  I just want to mention that the -- the -- Mr. Sedges, in his August 11, what appeared to be, you know, again -- looking again to be a motion for reconsideration, in the documentation and he's not an attorney so he wouldn't, you know, the Court gives him room on the presentation of things.

Seems to be making other allegations of a cross motion, essentially, with regard to preserving marital assets, concealment, alleged concealment, alleged co-mingling of marital assets.  Okay.

And -- so that is separate from what is -- what looks like a motion for reconsideration where he contends that he doesn't have the capacity to do what it is that the plaintiff established that as a status quo between the parties, that he was doing for a while, and apparently he's looking to recon -- have the Court reconsider the decision on that.

Colloquy                                    7

But if it turns out that it's an incapacity, then, like I said, I may have to revisit the order and allow the house to be sold.

So, Mr. Dell'Italia, I'll hear from you first.

MR. DELL'ITALIA:  Well, Your Honor, as I indicated in my client's certification, the house is -- was on the market, then Mr. Sedges took it off the market.  Now, I find out this week, Mr. Sedges sent me an email saying it's back on the market, in fact, they had a showing.

So I think I would ask that the Court, if they grant my application, that, you know, order that the house continue to be on the market, and that it be sold.

As far as the dire straits of the parties, a new issue has arisen this week, with the water service has to be replaced.  It's $9,200 --

THE COURT:  -- say that again, what has to be replaced?

MR. DELL'ITALIA:  Water service, Your Honor.

THE COURT:  But that -- that sounds like from -- from the curb into the house.  The --

MR. DELL'ITALIA:  No, it's -- unfortunately

it's -- it's from -- it's the responsibility of my client for the -- the service where it's going to.

THE COURT:  So -- so he's on city water and the -- the link into the city system, he's -- the homeowner's responsible for?

MR. DELL'ITALIA:  That's correct, Your Honor.

THE COURT:  Gotcha.  Hold on just --

MR. DELL'ITALIA:  I -- we have a bill for --

THE COURT:  Go ahead.

MR. DELL'ITALIA:  We have a bill for 9,200 --

THE COURT:  9,200.

MR. DELL'ITALIA:  -- neither of the -- yeah -- neither of the parties have the money.  I was just telling my client that if Mr. Sedges agrees and if we can get a possible buyer on the house, or a contract on the house, we can talk to the plumber about taking, you know, a little more and waiting for the closing.

But I -- I can't, you know, be -- have -- have Mr. Sedges decide tomorrow that he's aggravated with what Mrs. Sedges said, or whatever, and take the house off the market again.  This is -- it's just

Colloquy                    9

ridiculous.  I feel bad for this realtor.  He -- he sent out pictures to be -- all that, and then it's all of a sudden it's off the market now.

So there are certain things that have to be done.  The oil tank has to be taken out of the ground, and put, you know, outside, which is another expense.  Mr. Sedges had said that he was paying for it, in numerous emails and then he was gonna send me receipts.  I haven't received any.  But I don't know how he can pay for that and not be able to pay for the mortgage.

So I have no idea what's going on there.

But all I want, Judge, is to be able to sell this house.  My client has told me today, and think she's being very forthright.  She said, look, he owes me this back money, give it to me when I -- we sell the house.  But just at least going forward, pay this mortgage, or one half of this mortgage and pay the utility bills, the sewer water.  There's $1,300 owed.  He's -- owe $668.  Going forward.

And it'll only for another month or two.  Because, you know, Mr. Sedges shows how he doesn't have any money.  19 years they've been paying this.  They been doing this.  He doesn't mention anything, if you notice, in all of the treatises that he has

Colloquy                                    10

submitted, he hasn't mentioned one word about the fact that his sister lives with him and that she contributes to the household bills with him.

So, money was there. All of a sudden, we file a divorce complaint and the money's not there. It's the classic story.

So all I want -- I want the status quo -- more than anybody, 'cause I can't tell you the -- the number of emails I receive.

So if we can put the -- you know, the money -- reimbursement going -- be taken out of his half of the sales price, and maybe a little interest, or some interest on that, so that she gets, you know, something, in return. That would be great.

But I'm really afraid that Mr. Sedges is gonna use this house sale as a carrot on a stick. 'Cause there's another little piece of property that someone wanted to buy, a separate little lot, that Mr. Sedges agreed to sell it to the guy. It would have meant $9,000. It would have covered the water service. But now he said, no, he didn't want to sell it.

So we're -- I -- I need, you know, some closure --

THE COURT: Well, I --

Colloquy                11

MR. DELL'ITALIA:  -- on this.

THE COURT:  -- let me -- let me ask you a couple questions.  The -- first off, the -- both parties are on the deed on the house, right?

MR. DELL'ITALIA:  That's correct, Your Honor.

THE COURT:  And it's currently listed?

MR. DELL'ITALIA:  Yes.  And there was one showing yes -- yesterday, I believe, or the day before, and there's another showing coming up.

THE COURT:  And do you know what the listing price is?

MR. DELL'ITALIA:  What did they list it for?

PLAINTIFF:  --

MR. DELL'ITALIA:  550, Your Honor.  Which is reasonable.  I spoke with the realtor and -- 'cause originally they were gonna go like 639 which was ridiculous.

THE COURT:  Okay.

MR. DELL'ITALIA:  You're not gonna get --

THE COURT:  And what's the mortgage balance, do you know that?

PLAINTIFF:  --

MR. DELL'ITALIA:  150.  There's significant

Colloquy                                                    12

equity, Your Honor.

THE COURT:  That's what it sounds like.

MR. DELL'ITALIA:  And both of them want to get out.

THE COURT:  Okay.

MR. DELL'ITALIA:  I don't -- I don't understand the loggerheads.

THE COURT:  Okay.  All right.  Now, you have an interesting idea about this water situation. Another thing that came to mind, to me, is -- and it may be a problem if the mortgage isn't -- is the mortgage not current right now?

MR. DELL'ITALIA:  Oh, no, it's current right now.  As indicated in my client's certification, see the problem is, and I don't want to accuse Mr. Sedges of anything, but he knows that the mortgage is just in her name, not in his name. The property, the deed, is in both names.

So he has nothing to lose and everything to gain by not paying the mortgage.

THE COURT:  Yeah.

MR. DELL'ITALIA:  And just driving her nuts.

THE COURT:  Well -- I -- I -- I can understand that.  I -- I -- to your point, you just

Colloquy                                              13

want the house sold.

MR. DELL'ITALIA:  Yeah.

THE COURT:  So let's put the economic equitable distribution issues aside, all right?

MR. DELL'ITALIA:  Right.

THE COURT:  She -- she reserves her claim, all right.  Especially if it was status quo and he's supposed to contribute.  She reserves that.  Does -- because it's in her name and it's current, does it make any sense for her to take a quick HELOC?

MR. DELL'ITALIA:  To pay for the water?

THE COURT:  Yeah.

MR. DELL'ITALIA:  We can try, Your Honor. You know, the problem is, she's on social security too.

THE COURT:  But -- would she -- and social -- how old is the mortgage?  Like, when was it taken out?

MR. DELL'ITALIA:  20 -- 22 years ago.

THE COURT:  Oh.  And she -- she wasn't on social security at that time, right?

MR. DELL'ITALIA:  Not at that time, no. No.

THE COURT:  Okay.  So you're right.  It's gonna be hard for her to get a HELOC now.  Yeah,

Colloquy                                            14

that's right.

MR. DELL'ITALIA:  That's why I was thinking, the only thing that I could possibly do is tell the plumber, 92, we'll give him 97 if he waits for his money.  You know.  And I'll guarantee that in proceeds, but I need at least a contract of sale --

THE COURT:  Yeah.  Okay.

MR. DELL'ITALIA:  -- you know --

THE COURT:  Okay.

MR. DELL'ITALIA:  And the problem is, it's kind of a catch 22 too, because when people come to see the house now, there's water in the driveway.

THE COURT:  Yeah.

MR. DELL'ITALIA:  And we gotta say, okay, we're gonna fix that.

THE COURT:  And -- and you said the -- the property's deeded in both their names?

MR. DELL'ITALIA:  Yes.  At the time of the purchase, Mr. Sedges did not have a good enough credit, so -- and being that Mrs. Sedges was working and also I think he was on social security, so that's why --

THE COURT:  So --

MR. DELL'ITALIA:  -- it was --

THE COURT:  -- and is he -- he's currently

Colloquy                                    15

behind in his contributions to the mortgage?

MR. DELL'ITALIA:  Oh, yeah.  Yeah.  He hasn't paid anything, since the last --

THE COURT:  --

MR. DELL'ITALIA:  -- he hasn't paid -- when Your Honor issued that order back in June, he didn't pay anything.  Remember Your Honor gave him three months to catch up with the arrearage?

THE COURT:  Yeah.

MR. DELL'ITALIA:  And then to keep it current, June, July, August.  Didn't pay anything.

THE COURT:  Okay.

MR. DELL'ITALIA:  My client paid it. Initially, my client let it go for a month, but then I explained to her, he's ruining your credit.

THE COURT:  Yeah.  Yeah.

MR. DELL'ITALIA:  So she took it out of her -- you know, her retirement accounts that she has.

THE COURT:  Okay.  All right.  I get it.

All right.  Mr. Sedges, I'm gonna swear you in, just to ask you a couple questions, we'll go from there.

A L B E R T   S E D G E S, DEFENDANT SWORN

THE COURT:  All right.  Mr. Sedges, is it true that you haven't paid what it is that the plain

Colloquy                    16

-- plaintiff seeks from you?

MR. SEDGES:  Well --

THE COURT:  The $8,900 and the utility -- ? Don't give me your explanation, I want to first hear yes or not.

MR. SEDGES:  No, I have not paid it.

THE COURT:  Okay.  All right.  So -- and you don't have any prospect of paying it today, right?

MR. SEDGES:  Absolutely not.

THE COURT:  Okay.  All right.  So I'll tell you what I'm gonna do.  I'm not gonna take any further action with regard to paying it.  You still had the obligation to pay it because it's under a court order, but what I want to do, to Mr. Dell'Italia's concern is to not have you frustrate this closing process.  This sale process.  Okay.

MR. SEDGES:  Can I speak?

THE COURT:  Not yet.  I'll --

MR. SEDGES:  Okay.

THE COURT:  -- okay --

MR. SEDGES:  So you -- you're -- you just told me he told you I'm frustrating it, okay?  And you're just taking his word.  You didn't give me any time to respond to Mr. Dell'Italia.

Colloquy                                17

THE COURT:  All right.  Well, but --

because -- for two reasons --

MR. SEDGES:  --

THE COURT:  -- first Sir -- I'm gonna tell you.  I'm gonna tell you --

MR. SEDGES:  Okay.

THE COURT:  -- for two reasons.  All right?

MR. SEDGES:  Yeah.

THE COURT:  --

MR. SEDGES:  I'm not obstructing it.

THE COURT:  Mr. Sedges --

MR. SEDGES:  I'm not --

THE COURT:  -- Mr. Sedges.

MR. SEDGES:  Yes, Sir.  Yes.

THE COURT:  What I'm not gonna do is to get into a big back and forth about --

MR. SEDGES:  Okay, Sir.  I'm sorry.

THE COURT:  -- that, and especially -- especially when one of the people is an officer of the court.  And so I thought of a different way to resolve it.  All right.

MR. SEDGES:  Okay, Sir.  Yes, Sir.

THE COURT:  Because -- because you're -- you're not -- I understand, I see your papers, you contend for a couple different reasons why it is that

Colloquy                                           18

you're not paying the mortgage.  You're not paying the utilities.  I get it.  But because you're not, not -- I'm not determining whether it's right or wrong, but just as a consequence of not doing it, which puts the plaintiff at risk because her name is on the mortgage alone, I'm giving her power of attorney to manage this contract of sale and the sale of this house.  Doesn't change your money.  It doesn't change your money at all.  You're still on the deed.  I'm not changing that at all.  You still reserve all your rights to contend your claims that you want to do later on the distribution of the money.

But what I'm -- I'm not gonna do is to put the plaintiff in a position with only her name on the mortgage and you acknowledge for your -- I'll assume for the moment, you have a great reason not to pay it.  I'm saying under that circumstance, I'm not going to have her risk of not paying the mortgage tied to the fact that you're not paying the mortgage.

And so what I'm going to do -- she needs to protect her interests.  Her -- she has an additional interest above yours.  You have a deed interest.  She has a deed interest and to protect her credit.

MR. SEDGES:  --

Colloquy                                    19

THE COURT: And because of that -- because of that I'm gonna give her the power of attorney under the order. She will manage the sale of this property. She'll still confer with you, but she -- after conferring, she will be responsible for signing, agreeing to the contract, signing whatever has to take place to get this house sold.

Also, to -- to negotiate, to whatever you have to do to get this water link, that's -- that's unfortunate to say the least.

MR. SEDGES: No, I know.

THE COURT: To get that satisfied. Whatever she gets to do to negotiate that with Mr. Dell'Italia's help, they've gotta hustle on that and try to find the right plumber, or the right buyer, or both.

MR. SEDGES: I absolutely agree.

THE COURT: Okay. So --

MR. DELL'ITALIA: Your Honor, can I also ask, one other thing, I'm sorry to interrupt you.

THE COURT: Go ahead.

MR. DELL'ITALIA: There's also that other extra parcel that they have a buyer for. It's not part of --

THE COURT: Well, hold on. I understand

Colloquy                                    20

what you're saying, Mr. Dell'Italia.  Let's -- just baby steps.  Be patient with me for a second, okay?

MR. DELL'ITALIA:  Okay.

THE COURT:  All right.  Now, -- so Mr. Sedges, so that takes place -- that takes care of a certain amount of your opposition to their motion.  Your August 11 one.  So your August 11 one, you -- you deny -- you want me to deny the plaintiff's motion to enforce back mortgage payments.  I'm essentially postponing that by saying, listen, the proceeds, these will be solved upon the sale of the house.  Okay.

So there's -- the guns not to your head to come up with the money right now.  You're -- you're saying you're opposing the order, the plaintiff bring the mortgage current, contribute to all expenses.  But then you get into some other subjects, and I just want to address these other subjects for a second, okay?

MR. SEDGES:  Well, thank you.

THE COURT:  All right.  So you have in your cross motion, the first thing you put is the financial disparity and the history, I'm saying that is basically motion for reconsideration.  I already dealt with that, I said, status quo, and now you're

Colloquy                    21

trying to argue the same stuff that we heard way back when and I -- I said, hold status quo.

But I'm saying, I'm not doing anything with that because we're trying to get the house sold, and if we get the house hold -- sold, then some of this goes away.  All right?

The next one though is different.  You say the mortgage loan for the marital home is in the plaintiff's name.  Despite her higher income the plaintiff has failed to make mortgage payments for nearly three months, thereby placing the primary marital residence at imminent risk of foreclosure.

MR. SEDGES:  Right.

THE COURT:  Well, Mr. Dell'Italia has represented that the mortgage is current.

MR. SEDGES:  Well, if you let me speak I can tell you what happened?

THE COURT:  No.  No.  I don't want to know what happened.  I want to know, do you agree that it's current?

MR. SEDGES:  Do I agree it's current?  It's current now.

THE COURT:  Okay.  That's all that matters.

MR. SEDGES:  Now it's current.

THE COURT:  That's all that matters.

Colloquy                    22

MR. SEDGES:  Yes -- .

THE COURT:  Okay.  All right.  Now, let me go to your next one, which was interesting, this is a new subject.  This is concealment and -- co-mingling of martial assets.

MR. SEDGES:  Correct.

THE COURT:  Plaintiff has a bank account containing $30,000 which she claims is her assets but which are believed to be co-mingled.  Furthermore, the plaintiff has unilaterally removed valuable marital assets from the home.  This action is in clear -- to conceal assets.

Have you propounded any -- and I -- I assume you know what I'm talking about, you have to tell me if you don't.  You know that each party gets --

MR. SEDGES:  I'm sorry.  I'm sorry, what did you say, I didn't hear that --

THE COURT:  -- each -- each -- each party has the right --

MR. SEDGES:  Right.

THE COURT:  -- to serve discovery.  Interrogatories.  Request for documents.

MR. SEDGES:  Okay.  Okay.  Okay.  I'm sorry.  Go ahead.

Colloquy                                          23

THE COURT:  No, that's fine.  Have you done that?

MR. SEDGES:  Have I served an interrogatory or a discovery?

THE COURT:  Yes.

MR. SEDGES:  No, I haven't because I mean -- I'm not an attorney, I guess maybe I should have, but my -- my putting that in there, saying there's -- I know 'cause I said, hey listen, where's all the jewelry?  It's in the safety deposit box.  I said, well, why is it in a safety deposit box?  I mean, you know, I've never heard of a safety deposit box since we've been married, you know.  And I was thinking to myself, as a layman, I was saying, listen, why don't we sell some of the jewelry, it's very expensive, okay.  It's part of the marital estate.

And -- I mean, just the -- just the -- just the tennis bracelet alone is $7,500, I mean, just that on the -- on the surface.  You know, so along with, you know, many other assets that are there.  You know, so I'm concerned because it was always in the house, the jewelry.

So when I went to go get the jewelry, or take a look at it, or whatever, -- going out, 'cause I said to her one time, I said, hey listen, how come

Colloquy                                              24

you're not wearing so and so, or you're not wearing this? Oh, I don't know, I don't know. I said, what do you mean you don't know? So I said, I'm gonna go take a look. I said, where's all the jewelry? Oh, I had it in a safety deposit box. I said, well, is my name on it? No, my brother's name's on it.

That's on her CIS. And in her CIS she doesn't even put the value in. What good is the CIS if you're not gonna -- in the asset section, I believe it page eight, you know, she says on page five she has a safety deposit box, but on page eight she says, okay, tangible items. Zero.

Well, there are tangible items and there's no zero amount. Those are very expensive --

THE COURT: All right.

MR. SEDGES: -- just one --

THE COURT: So, Mr. Sedges, I get it. You're gonna have to serve --

MR. SEDGES: Okay. Thank you. Thank you.

THE COURT: -- discovery. You're gonna have to serve discovery.

MR. SEDGES: I will serve discovery.

THE COURT: All right. Now, you know that there are resources here at the county for people that are self represented --

Colloquy                                      25

MR. SEDGES:  They know me by name.  They know me by name, Sir.

THE COURT:  Well, then -- then you have no excuse.  You have no excuse.

MR. SEDGES:  No, no, I'm doing it very well with the resource center -- you say to me --

THE COURT:  Oh, that's it.  Yeah, go to the resource center.

MR. SEDGES:  Yeah.  Room 105.  But -- but when I get there, the only way I can get there is go through like either Lyft, or Uber, I have no vehicle. I have nothing -- I'm -- all this money is being spent, wasted.

THE COURT:  I can't fix everything.

MR. SEDGES:  Wasted.

THE COURT:  Go do your discovery.  Go do your discovery.

MR. SEDGES:  I will.  No --

THE COURT:  Okay.

MR. SEDGES:  -- Mr. -- I'm sorry, no, no, no -- Judge, I didn't mean to say, Mister.  I'm sorry.

THE COURT:  You're fine.  You're fine.

MR. SEDGES:  No, I meant, I didn't mean to say that.

Colloquy 26

THE COURT:  Oh, no, I'm not worried.

MR. SEDGES:  Your Honor -- okay.  All right.  Thank God.

THE COURT:  It's okay.  It's fine.

MR. SEDGES:  Okay.  Fine.  Your Honor -- Your Honor --

THE COURT:  Yeah.

MR. SEDGES:  -- the things that -- I will do that.  I will do the discovery.  I'm gonna look it up on AI 'cause AI -- I've been doing most of my homework on AI and I believe that the last time that we had a Zoom and there was the -- there was 30,000 in the bank account and I don't know how much of that went to Mr. Dell'Italia --

THE COURT:  Mr. Sedges, there's nothing I can do about that.  You're gonna have to do discovery to confirm that.  I can't do anything with that information right now.

MR. SEDGES:  Yes, Sir.

THE COURT:  Because you're gonna do discovery on it, Mr. Dell'Italia's --

MR. SEDGES:  Yes, Sir.

THE COURT:  -- gonna respond to you on that.

MR. SEDGES:  Yes, Sir.

THE COURT:  Then -- then you'll see your different opinions about it, and then ultimately that information will be used at trial, unless the parties settle before.

MR. SEDGES:  I am trying to cooperate, Sir, I'm sorry.

THE COURT:  I didn't say you weren't.  All I'm saying --

MR. SEDGES:  No, no, I know you didn't. No, no, I just want to let you know that I am.  I'm not trying to be difficult, believe me.

THE COURT:  Okay.  I believe you.  All right.

MR. SEDGES:  Thank you.

THE COURT:  I think I've covered all the subjects here.  Now, Mr. Dell'Italia, this other piece of property is not in anybody's motions here, so what are we talking about?

MR. DELL'ITALIA:  No, I know.  I apologize, Judge.  I just really found out about it today.

THE COURT:  In who's name is it?

MR. DELL'ITALIA:  Both names.

THE COURT:  Okay.  And -- like a --

MR. DELL'ITALIA:  -- it's kind of the same property that when they purchased the house, this

Colloquy                                          28

piece came with it.

THE COURT:  So it -- it's a separable lot?

MR. DELL'ITALIA:  Yes.  A little section. And there's an individual -- apparently in the back of all these houses, there's little sections of property that run across, and the person that wants to buy this little section owns the house that's in front of the section.  Wants to use it to put up a swing set for his kids.  And he negotiated a price, or I think a sale with Mr. Sedges.

And it was agreed upon, but then when Mr. Sedges took the house off the market, he took that off the market too.

THE COURT:  Okay.  And so -- so it's not really -- you can't develop it by itself, it's just a little piece of property.

MR. DELL'ITALIA:  No, no.  No, you -- it would take you three minutes to cut the lawn there, from what I understand the size --

THE COURT:  Oh, okay.  All right.  Mr. Sedges, I'll hear from you on that, just this little lot here.  What's the story with this little lot?

MR. SEDGES:  Okay.  On the lot itself, the real estate agent that we have, Dave, he said, listen I'm negotiating that lot for you 'cause -- the fellow

who's interested in purchasing the lot, they're friendly, you know, so I said, oh, great. I said, wonderful. You know, so he got a price, tentatively. Carol and I signed it. I gave it back to him. And every other week, I don't want to pester him, but you know, I would email him, Dave, how we doing? How are we making out with the lot?

He said, well, there's a problem with the lot. And the problem with the lot, and it has to be, you know, Carol and I's lot, just can't be -- nothing can be simple. His property -- Eric's property and my property, there is a six inch line --

THE COURT: Can I -- can I -- can I stop you for a second?

MR. SEDGES: Yes, Sir.

THE COURT: Are you willing to -- Mr. Dell'Italia is saying that you are unwilling to sell this property now. Is that still the case?

MR. SEDGES: Not at -- no, Sir. As a matter of fact, I told Dave, when I put the house back on the market, I also put in there, I said, Dave, also let Eric know I'd like to sell that parcel of land.

THE COURT: Okay. There's your answer, Mr. Dell'Italia.

Colloquy                                    30

MR. DELL'ITALIA:  Okay.  That's fine, Your Honor.  I'll take him on his word.  I don't want to involve the Court in an order, something that I didn't make an application on.  I -- I know and I apologize for bringing it up --

THE COURT:  Well, but -- no, but -- I appreciate you saying that, but I -- this is a kind of consent.  I can just add in here is that on consent the --

MR. DELL'ITALIA:  Okay.

THE COURT:  -- the -- but you have to give me a better description.  What -- what's the description of the lot?  This is an adjacent lot?

MR. SEDGES:  No, no, no, no.  The --

THE COURT:  Well, I'm asking Mr. Dell'Italia.  He'll give me --

MR. SEDGES:  Oh, I'm sorry.

THE COURT:  No, that's all right.

MR. SEDGES:  I am so --

THE COURT:  'Cause he'll -- it's okay.  Because he'll give me legal terminology that I'm looking for.

MR. SEDGES:  Oh, okay.

THE COURT:  So is it a con -- contiguous, adjacent?  What is it, Mr. Dell'Italia?

Colloquy                                          31

MR. DELL'ITALIA:  It's actually contiguous, Your Honor, to the property.

THE COURT:  Okay.  All right.  It's contiguous.  Do we have -- and it has it's own lot number?  Is it part of the same block with its own lot number?

MR. DELL'ITALIA:  Yeah, the realtor has the map.  I can get that for you, Your Honor, what the lot and block number is.

MR. SEDGES:  I have it right here.

THE COURT:  Oh, go ahead.  Give it to me.

MR. DELL'ITALIA:  Oh, you have it?

THE COURT:  Give it to me, Mr. Sedges.

MR. SEDGES:  All right.  Hold on.  All right.  Hold on.  All right.  Hold on.  Hold on.  Hold on.

(Pause in proceeding)

MR. SEDGES:  I have a drawing here.  Hold on.  I'm sorry, I didn't know it was going to be asked for, just give me one moment, please.

THE COURT:  That's all right.  That's all right.

MR. SEDGES:  All right.  --

THE COURT:  You're looking at a survey?

MR. SEDGES:  Yes, I am.

Colloquy                                              32

THE COURT:  Okay.

MR. SEDGES:  Okay, now -- let me get another pair of glasses.  So, surveyed 2000 -- .  Jesus, you know it's -- you know, Judge, it's so, so small.  I think it's lot 22, but I mean, oh my God.  It's really, really tiny.

THE COURT:  All right.  Can -- can --

MR. SEDGES:  I'm so sorry.  I tried to help.

THE COURT:  -- that's all right.  That's all right.  Do we have an approximate size, so I can just put some sort of description?

MR. SEDGES:  -- .  You know what, it -- it looks like -- I hate to say -- our house is like a -- like a -- and it looks like a handle.  So it's about maybe say -- according to his last estimates, it's about 10 feet wide and about a good 30 feet long.  So it looks like a large handle.

THE COURT:  Gotcha.

MR. SEDGES:  If you -- you know what I'm saying?  Like, our house is like a block, like -- it looks like our house is like a block, the property is a block, and if you took it, you put a handle on it, it'd look like a mallet.

THE COURT:  Okay.  Mr. Dell'Italia, I would

Colloquy                                          33

just put in, contiguous lot, with approximate dimensions of 10 feet by 30 feet, on consent is also to be sold with the marital home lot.  Is that okay?

MR. DELL'ITALIA:  That's fine, Your Honor.

THE COURT:  Okay.  All right.  I think --

MR. SEDGES:  -- explained it enough for the realtor and -- you know, -- the realtor is a very nice guy, with a very good outfit, and I've been -- I've been in constant contact with him.

THE COURT:  Okay.  Perfect.

All right.  I think we've covered everything here.  We'll get the orders out as soon as we can, but it's effective right now.

MR. DELL'ITALIA:  Okay.  Thank you very much, Judge.

THE COURT:  Okay.  You're welcome.

MR. SEDGES:  All right.  Thank -- thank you, Judge.

THE COURT:  You're welcome.  Have a good rest of the day and a nice weekend.

MR. SEDGES:  Yeah, you too.

THE COURT:  Thank you.


                    (Hearing concluded)

34

## Certification

I, Deborah Hashimoto, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CourtSmart, time stamp 1:36:53 to 2:10:53, is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings as recorded.

*/S /Deborah Hashimoto*                    Date: 3-7-2026

Deborah Hashimoto #631

_____          _____

KING TRANSCRIPTION SERVICES                    Date
3 South Corporate Drive Suite 203
Riverdale, New Jersey 07457
(973)237-6080

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION/FAMILY PART
MORRIS COUNTY
DOCKET NO.:  FM-14-000773-25
A.D. # _____

---------------------------- )
CAROL SEDGES,                )
                             )               TRANSCRIPT
        Plaintiff,           )
                             )                   OF
vs.                          )
                             )          CASE MANAGEMENT
ALBERT SEDGES,               )
                             )             CONFERENCE
        Defendant.           )
---------------------------- )

                    Place:  Morris County Courthouse
                            (HEARD VIA ZOOM)

                    Date:  October 8, 2025

BEFORE:

    HONORABLE MARTIN F. BARBATO, J.S.C.

TRANSCRIPT ORDERED BY:

    ALBERT SEDGES

APPEARANCES:

    JOHN P. DELL'ITALIA, ESQ., (Dell'Italia & Santola)
    Attorney for the Plaintiff

    ALBERT SEDGES
    Defendant, Pro Se

                        Jill Campbell
                        KING TRANSCRIPTION SERVICES
                        3 South Corporate Dr., Suite 203
                        Riverdale, NJ 07457

                        Audio Recorded
                        Recording Opr: Elsa Hernandez

2

I N D E X

| PROCEEDING | PAGE |
|---|---|
| Case Management Conference | 3 |
| Discussion re Tax Returns | 5 |
| Discussion re Bank Car | 10 |
| Discussion re Bank Account | 17 |
| Discussion re Safety Deposit Box | 30 |

I N D E X   TO   W I T N E S S E S

| Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

No witnesses were called during this proceeding.

I N D E X   TO   E X H I B I T S

| NUMBER | DESCRIPTION | ID | EVID |
|---|---|---|---|

No exhibits were cited during this proceeding.

Colloquy                                    3

THE COURT:   -- record in the matter of Sedges v. Sedges, docket number FM-14-773-25.  I'll take appearance of counsel first, please.

MR. DELL'ITALIA:  John P. Dell'Italia, Dell'Italia and Santola, appearing for Carol Sedges, who I also have in my office, Your Honor.

THE COURT:  Okay.  And the record will reflect that the attorney -- counsel and the parties are appearing virtually and that the Defendant is self-represented.

All right, our last conference on this was September 12.  Actually, that was the motion day.  There was an order that was issued thereafter.  There was also an order that was issued September 19, and we have current -- a current motion and cross-motion, but we're (audio stops at 9:56:25 a.m, continues at 9:56:33 a.m.).  It's not credible.  It's simply not credible.  And if you -- if you and your client wanted to make an order to reverse that, should have did that.

Now, maybe you're trying to do that now with your motion for reconsideration, but I addressed this months ago now -- you say July, I thought it was even June, okay -- on his use of the vehicle.  And I understand, and I recall, you were there, and you were representing what you thought you knew from her.

But I'm telling you this.  What I'm not going to

Colloquy                                                  4

do is have a plenary hearing to prove, during the course of a 22-year marriage with one car, that he's never used that car.

And what I also find difficult to understand is why the car -- it's been in service for all this time. It's been at the service station, wherever -- whoever's to do the repairs -- and now we come to understand that it's upside down, that the cost is not worth it to do the repairs.

MR. SEDGES:  If I may say something, please?

THE COURT:  No, you may not yet.  I'm still talking to counsel.

MR. SEDGES:  Okay.  Yes, sir.

THE COURT:  Thank you.

MR. SEDGES:  Yes, sir.  Sorry, sir.

MR. DELL'ITALIA:  So, Your Honor --

THE COURT:  Counsel, we need a solution to this. She wants --

MR. DELL'ITALIA:  And I --

THE COURT:  Think about it.  Think about it for a second.  If I recall correctly -- and you correct me, all right, if I'm wrong on the facts here -- she wants money from him which he's not giving, and he contends he needs the car to go make the money for the money that he's not giving to her.

MR. DELL'ITALIA:  Your Honor, he also contends that he's permanently disabled and he can't work anyway. And if we look at his prior income tax returns, there is nothing to indicate that he ever had any outside income.

THE COURT:  For what years?

MR. DELL'ITALIA:  '23, '22, '21.

THE COURT:  Did he file a tax return for '24, do you know?

MR. DELL'ITALIA:  '24 --

THE COURT:  They filed separately or jointly?

MR. DELL'ITALIA:  Yeah, they both filed in '24, and there was no -- no income that he -- they just filed --

THE COURT:  They filed jointly?

MR. DELL'ITALIA:  -- and there's no income --

THE COURT:  Counsel?

MR. DELL'ITALIA:  No income from outside.

THE COURT:  No, counsel, they filed jointly?

MR. DELL'ITALIA:  Yes.

THE COURT:  Okay.  All right.  Now, Mr. Sedges, only on this subject -- only on this subject --

MR. SEDGES:  Sure, yes, sir.

THE COURT:  -- is it true that you're permanently disabled and not working?

MR. SEDGES:  Well, it's not true, no.

THE COURT:  Well, how do you prove -- how do you

Discussion re Tax Returns                                    6

explain the gap between your contention that you're working -- and, by the way, I'm going to swear you in before you say another word.

MR. SEDGES:  Sure, of course.

THE COURT:  Please raise your right hand.

MR. SEDGES:  You bet.

A L B E R T   S E D G E S, DEFENDANT, SWORN

THE COURT:  Please -- you may put your hand down, and now, for the record, state your full name, spell your last name.

MR. SEDGES:  Sure.  Albert Nicholas Sedges, spelling my last name S-E-D-G-E-S.

THE COURT:  Okay.  Are you receiving disability income?

MR. SEDGES:  I am.

THE COURT:  From Social Security?

MR. SEDGES:  Yes, I am.

THE COURT:  And when did you start receiving it?

MR. SEDGES:  I started receiving it in 1997.

THE COURT:  So you get disability income since -- for over 20 years -- 25 years.

MR. SEDGES:  Correct.

THE COURT:  Okay, and so why, if you're working --

MR. SEDGES:  Right.

THE COURT:  -- why do you show no income on the joint tax returns with your wife?

MR. SEDGES:  Because most of my work is cash.

THE COURT:  Oh, so you're evading income tax?

MR. SEDGES:  No, I'm not evading --

THE COURT:  Well, it sounds like it.

MR. SEDGES:  -- I'm not evading anything.

THE COURT:  It sounds like it, because if you're making any kind of significant income from working and it's not going to your tax return because it's cash, you have a problem.

Now, I think you have to pick which side of the story you want to be on.  You're either making a significant amount of money, which is going unreported, or you're just making petty cash here and there.

MR. SEDGES:  Well, the best way for me to clear that up, and I'm sorry that I was, you know, so forceful with that by explaining it that way, there are many times, okay, where -- yes, there are periods of time where I can't work, because I -- my back gets reinjured, and that's in one of my certifications in my --

THE COURT:  No, but, Mr. Sedges, I understand that could happen periodically.  I get it.

MR. SEDGES:  Yes, yes.

THE COURT:  But if the majority of the time

you're not working, and the only indicia I have of you working --

MR. SEDGES:  No, that's not -- that is not true.

THE COURT:  No, no.  I said it as a hypothetical. If it were --

MR. SEDGES:  Oh, okay.

THE COURT:  -- if it were that the overwhelming majority of the time you're not working, that indicates two things.

MR. SEDGES:  Okay.

THE COURT:  First, it's consistent with no reporting of income.  Second, it means you don't need the vehicle.  If on the other hand --

MR. SEDGES:  No, that's not true.  That's not true.

THE COURT:  Mr. Sedges, I'm not done with my hypothetical.

MR. SEDGES:  Okay, I'm sorry.

THE COURT:  You have to pick between one of these.  Pick one.  So it must -- it can be that you are working the overwhelming majority of the time such that you need the car, and therefore you need to report your income on your income tax or --

MR. SEDGES:  Right.

THE COURT:  -- you're not working the

overwhelming majority of the time, and therefore you don't have to report your income, because there's nothing to report, and you don't need the car.  Pick one.

MR. SEDGES:  Okay, well, here's the one I'm going to pick but with what I'm going to say to you right now, is that I am -- I do have tax records.  I worked at Home Depot.  I worked at Auto Zone.  I worked -- I worked at --

THE COURT:  I'm going on the tax returns.  No, that's not tax records.  Tax records are the tax returns.

MR. SEDGES:  Right, yeah, of course, and they are applied to my tax returns in '21, '22, except for '23 and '24.

THE COURT:  Hold on just a minute.

Mr. Dell'Italia -- Dell'Italia, I apologize -- has you looked at the tax returns for these people?

MR. DELL'ITALIA:  Yes, Your Honor, and --

THE COURT:  Which years?

MR. DELL'ITALIA:  -- I don't have '21 returns --

THE COURT:  Do you have --

MR. DELL'ITALIA:  -- but I do --

THE COURT:  -- do you have 2020?

MR. DELL'ITALIA:  2020, no.

THE COURT:  What do you have, just '22-'23?

MR. DELL'ITALIA:  '22, '23, '24.

THE COURT:  And --

MR. DELL'ITALIA:  And there's no --

THE COURT:  -- does he have income on any one of those three?

MR. DELL'ITALIA:  No.

THE COURT:  All right, Mr. Sedges, pick, pick. Did you underreport your income -- did you underreport your income, and therefore you do need the car, or you properly reported that you had no income, and therefore you don't need the car?

MR. SEDGES:  Well, I underreport -- I underreported the income, number one.  Number two, I still need the car --

THE COURT:  You know you're under oath and you're recorded?

MR. SEDGES:  -- even if I wasn't working, okay, which I -- which I was working when she took the car away. I had plenty of jobs lined up at the time, okay.  If -- let's just say for the sake of argument, I'll give a hypothetical too, okay.

Now, I can't work, I don't work, never have worked.  What does that have to do with a marital asset after 22 years of co-mingling back and forth to the bank --

THE COURT:  Yeah, I'll tell you what it has to do with it.  It's because when I gave you access to the car, you said you needed it for work.

MR. SEDGES:  I did.

THE COURT:  That's -- no, but --

MR. SEDGES:  Let me tell you something.  If that was the --

THE COURT:  You can't be dabbling in work and holding up the car.  That's not use.

MR. SEDGES:  I'm not --

THE COURT:  That's not use.

MR. SEDGES:  -- I'm not holding up the car.  We have two vehicles, sir.

THE COURT:  Okay, we're moving on from this.

MR. SEDGES:  Sir --

THE COURT:  You're giving an insufficient answer.  You're giving an insufficient answer, okay.

MR. SEDGES:  Sir, sir --

THE COURT:  Here's your -- here's your other choice.  Can you write the check for the $6,000 to have this car repaired?

MR. SEDGES:  It doesn't need that repair.  It already has $8,000 worth of repairs last year.  It's --

THE COURT:  Mr. Sedges, the car is in a shop --

MR. SEDGES:  -- it's practically brand new.

THE COURT:  -- right now.  The car is in a shop right now.

MR. SEDGES:  No.

THE COURT:  I --

MR. SEDGES:  No.

THE COURT:  Listen.  This attorney is an officer of the court.

MR. SEDGES:  Yes.

THE COURT:  He's got a real problem with the Court if he's lying to me.  He's saying that --

MR. SEDGES:  Oh, absolutely.

THE COURT:  -- he has information that this car needs $6,000 worth of work and it's not worth it.

MR. SEDGES:  Where's the bill?  Where's the estimate?

THE COURT:  Mr. Sedges, I'm -- no.  You're not asking me questions.  I'm asking you.

MR. SEDGES:  I'm sorry.

THE COURT:  Do you want to pay to have this car fixed, yes or no?

MR. SEDGES:  Yes, I do.  Give me the car; I'll take care of it.

THE COURT:  I'm not going to give you the car.  You would only get access to the car.

MR. SEDGES:  Well, that's what -- I'm sorry.  I need to have access to this vehicle to see for myself.  I want to bring it to my own mechanic, okay?

THE COURT:  No, it stays where it is.  This has

Discussion re Car                                    13

been going on for months.  It stays where it is.  You'll go to the mechanic where the car is and have it fixed there if you're going to come up with money.  Do you have $6,000 just in case that is the true amount?

MR. SEDGES:  No, I don't, but I'd like to know who this mechanic is, this --

THE COURT:  I'd like to know how much you do have to put towards a mechanic.

MR. SEDGES:  Pardon me.

THE COURT:  How much cash do you have on you to make a payment to a mechanic?

MR. SEDGES:  Zero.

THE COURT:  That's what I thought.  That is what I thought.

MR. SEDGES:  And you want to know why?  Because I don't have the vehicle.

THE COURT:  No.

MR. SEDGES:  If I would have been given the vehicle --

MR. SEDGES:  Mr. Sedges, the point is this.  You want things, but you don't have wherewithal to do anything.  You're not paying your -- the obligations under the orders with regard to the house.  You haven't been doing that.  And yet you want the car to go get money that you don't report, but then somehow you don't have any money on you.

Discussion re Car                                          14

MR. SEDGES:  Look, I think that -- I think what's happening here is you definitely without a doubt -- not you personally, okay -- but I think this is conflating two different issues here.  That's my opinion.  So all I'm trying to get across the table here is that, in the very beginning, the car needed a brake job.

Now it's -- now -- that was their line.  Their big thing back then was, well, we don't have the car, because it needs a brake job.  That's on the record.  They even have a letter from this Mr. Ortiz, who I have never heard about, okay, stating -- hold on -- stating that he, okay, is the mechanic -- never heard of this guy, don't know who he is, okay -- he is the mechanic for my wife, and the reason he's holding onto the car, bottom line, at the end of that letter, is that it needed brakes.

I have -- I have asked you in several supplemental certifications, okay, and letting you know, okay, that, look, if it's a brake job, why is it taking this long?  Now all of a sudden it's irreparable, and we have documentation from the dealership of $8,000, Your Honor, of work that was done to the car.  My wife told me just a couple of months ago --

THE COURT:  Mr. Sedges, that's enough.

MR. SEDGES:  -- it's practically brand new.

THE COURT:  That's enough.  I'm not having a

plenary hearing today.  This is a case management conference.

MR. DELL'ITALIA:  If I may just say one thing, Your Honor.

THE COURT:  Go ahead.

MR. DELL'ITALIA:  He's talking about that $8,000 worth of work.  That was done 12 years ago.

THE COURT:  I was going to say --

MR. SEDGES:  It was not.

THE COURT:  -- I'm sure it was not done yesterday.  It wasn't done this year.  It wasn't done in 2024.  Nevertheless, nevertheless --

MR. SEDGES:  It was done last year.

THE COURT:  -- counsel, counsel, your client has a choice.  She will first, today, get the written repair estimate that she's obtained and give it to Mr. Sedges today.

MR. DELL'ITALIA:  Okay.  I'll have her go right to the car -- the mechanic.

MR. SEDGES:  No, you have to get a full estimate and breakdown what it needs.

MR. DELL'ITALIA:  I'll have her do that today, Your Honor.

THE COURT:  Okay.  Now, the next thing is by Friday I want to hear from both of them.  Mr. Sedges will write to me, write to the Court, by close of business Friday, and, Mr. Dell'Italia, you'll write to the Court on behalf of your client what they intend to do.

If she is not going to be making the repair, once she gets the repair bill, she's committed to not making the repair bill, he will first be given -- although I expect the answer, because he's got to be consistent -- he'll be given the option to get the money to make that repair, only there.  If he doesn't have the money, then she must immediately sell it for parts.  That car cannot sit around doing nothing.

MR. DELL'ITALIA:  Okay, no problem, Judge. That's what she intended to do.

MR. SEDGES:  Where does that money go?

THE COURT:  It -- marital funds.

MR. SEDGES:  Thank you.  Thank you.

THE COURT:  You're welcome.  Hold on.

MR. SEDGES:  Sure.

THE COURT:  Okay.  Mr. Sedges --

MR. SEDGES:  Yes, sir.

THE COURT:  -- you were given access to the bank account.  Are you getting it?

MR. SEDGES:  No, I am not.

THE COURT:  Which bank account are we talking about, Mr. Dell'Italia?

MR. DELL'ITALIA:  Your Honor, it's a -- it's a bank account that's been her account for the entire marriage, and it was utilized by her own.  Mr. Sedges would give her cash for his one-half of the mortgage.  She would put it in the bank account and pay the mortgage.  It was never a joint account, and this is clear in the motion -- my motion for reconsideration on your September 19th -- from your September 19th order.

THE COURT:  Hold on, please.

MR. DELL'ITALIA:  Mr. Sedges has his own account that he utilizes --

MR. SEDGES:  No, I do not have an account.

THE COURT:  Hold on.  Mr. Sedges, do not jump in.  Hold on.

MR. DELL'ITALIA:  Well, I don't know whether he has an account, but he pays the utility bills, the -- he was paying the, you know, paying PSE&G or whatever, electric and gas.  I don't know how, whether it was cash or from his own bank --

MR. SEDGES:  Yeah, through my -- through my debit card -- there's your answer -- for Social Security.

MR. DELL'ITALIA:  Debit card is a bank account.

MR. SEDGES:  Well, it's a bank account with

Discussion re Bank Accounts                    18

what --

THE COURT:  Mr. Sedges --

MR. SEDGES:  -- my Social Security in it.

THE COURT:  -- Mr. Sedges, Mr. Sedges --

MR. SEDGES:  Yes, sir.

THE COURT:  So --

MR. DELL'ITALIA:  So that --

THE COURT:  Go ahead, counsel.

MR. DELL'ITALIA:  -- that verifies that he does have his own account.  He has a debit card that -- Social Security goes into that account, just like the account that she has, that she's been utilizing solely for her purposes and to pay the mortgage and that her Social Security goes into.

MR. SEDGES:  Okay, if her Social Security --

THE COURT:  Hold --

MR. SEDGES:  -- goes in there, that's my money too.

THE COURT:  -- hold on.  Hold on.

MR. SEDGES:  You can't have it both ways.

THE COURT:  Do you have -- do you have a separate bank account in your own name?

MR. SEDGES:  No, I do not.

THE COURT:  Well, then, how do you get your disability payment from Social Security every month?

Discussion re Bank Accounts                    19

MR. SEDGES:  Listen, you got to be kidding me, and I don't mean that as an insult, sir.  But, please, I'm a little frustrated that people do not know that.

THE COURT:  No, no, no.  I want -- I want an answer.  I'm not insulted, but I want an answer to my question.

MR. SEDGES:  Okay, which question?  I'm --

THE COURT:  How do you -- do you get direct deposit from the -- or do you get a paper check every month?

MR. SEDGES:   I get a -- I get a -- I get a direct deposit.

THE COURT:  Into what account?

MR. SEDGES:  Into what they call a direct express debit card that Social Security uses for recipients --

THE COURT:  That's an account.

MR. SEDGES:  -- like myself.

THE COURT:  That's an account.

MR. SEDGES:  Okay, it's an account.  That's great, but what kind of money is in there?  I don't have $30,000 in there.  Listen, we have been using this account as a hub for our family.

THE COURT:  No, that's a different story.  Hold on.  Hold on.  Use of money is separate from the money coming in.  I'm dealing with the money coming in right now.

Discussion re Bank Accounts                    20

So you have Social Security comes in.  What do they give you?  You have a debit card, one, and they --

MR. SEDGES:  Yes, it's a --

THE COURT:  -- replenish every month?

MR. SEDGES:  Yes, sir.

THE COURT:  They're replenishing it?

MR. SEDGES:  Yes, sir.  It's a -- yes, sir.  It's a debit card that Social Security gives you.  Social Security gives you this debit --

THE COURT:  And you have just one?

MR. SEDGES:  -- card and --

THE COURT:  You have one, and it goes into your wallet?

MR. SEDGES:  Right, correct.  The debit card is a Master Card that they give you.  It's a -- it's like a regular credit card, but it's a debit card, okay.

THE COURT:  Okay.

MR. SEDGES:  And so what they do, Social Security, because they don't want to send checks out anymore and cut down on paperwork, whatever, I guess -- I don't know -- but it's very convenient.  The money goes in there.

THE COURT:  And how much goes in every month?

MR. SEDGES:  $1,465.

THE COURT:  Now if I was to roll the camera

back --

MR. SEDGES:  This is all part of the record, by the way.

THE COURT:  -- if I was to roll the camera back five years ago to 2020 --

MR. SEDGES:  Sure.

THE COURT:  -- you were -- you've been receiving this, you said, since 1997.

MR. SEDGES:  Correct.

THE COURT:  What were you doing with that money and that debit card in 2020?

MR. SEDGES:  What was I doing with it?

THE COURT:  Yeah.  As to the marital home and the marital --

MR. SEDGES:  Yeah.

THE COURT:  -- expenses --

MR. SEDGES:  I was paying.

THE COURT:  -- what were you doing?

MR. SEDGES:  Yeah, I was --

THE COURT:  Paying what?  Paying what?

MR. SEDGES:  I was paying the bills.

THE COURT:  What bills?

MR. SEDGES:  Or help -- I was help paying the bills.

THE COURT:  Help -- help paying, okay.

Discussion re Bank Accounts                                    22

MR. SEDGES:  Yeah.

THE COURT:  So with the debit card, you're able to go to the ATM and take out cash?

MR. SEDGES:  Correct.

THE COURT:  And you could go to any ATM, right, because you didn't have an actual bank account?

MR. SEDGES:  Correct.

THE COURT:  You can go to -- you can go to the QuickChek.  You can go to 70-11.

MR. SEDGES:  And that's normally where I would go, the QuickChek, yes, sir.

THE COURT:  Okay, all right.  And back in 2020, waś Miss Sedges handing you cash?

MR. SEDGES:  Was Mr. Sedges handing me cash?

THE COURT:  Mrs., Mrs.  Was she -- back in 2020, you're giving her money for your contribution to bills.  Was she handing you money back for any reason?

MR. SEDGES:  Well, yeah, of course.

THE COURT:  She was giving you money?

MR. SEDGES:  Yeah.

THE COURT:  For what?  You had money.

MR. SEDGES:  No, I did not have money.

THE COURT:  You had the money from your disability on your debit card.  You weren't giving her 100 percent of what's in the card, right?

Discussion re Bank Accounts                               23

MR. SEDGES:  Well, I was -- I was giving her $11 -- I guess it was $1,120 for the mortgage.

THE COURT:  But you weren't giving her 100 percent of the money.

MR. SEDGES:  No, the rest of the money went to go paying, you know, you know, for like, say, food for the house --

THE COURT:  I understand.

MR. SEDGES:  -- or gas for the car or --

THE COURT:  I understand.

MR. SEDGES:  -- something like that, yeah.

THE COURT:  So you get your debit card, you go to the ATM, you take out cash, --

MR. SEDGES:  Right.

THE COURT:  -- you give it to her, and there's still a balance on the card, and you use that to go buy food, right?

MR. SEDGES:  Sure.

THE COURT:  Now, in addition to that, in 2020 --

MR. SEDGES:  Yes.

THE COURT:  -- was she coming to you and saying, Albert, here's some -- here's some pin money, here's some cash for you to spend?

MR. SEDGES:  No, she wouldn't say, Al, here's --

THE COURT:  She didn't do that?

Discussion re Bank Accounts                                    24

MR. SEDGES:  -- she wouldn't say here's pin money for -- cash for you to spend.  That's -- and I don't mean that your question is ridiculous, but that would be ridiculous in a marriage where --

THE COURT:  No, in a way --

MR. SEDGES:  -- you know --

THE COURT:  -- in a way, you're right.  It is a ridiculous question.  But I needed the ridiculous question to make a point, all right?

MR. SEDGES:  Sure.

THE COURT:  You -- it sounds like --

MR. SEDGES:  No, she's --

THE COURT:  -- Mr. Sedges --

MR. SEDGES:  -- she's not gonna hand me pin money --

THE COURT:  -- Mr. Sedges, Mr. Sedges --

MR. SEDGES:  Here's what --

THE COURT:  -- Mr. Sedges, I know she's not going to do it.

MR. SEDGES:  Sorry, sorry.  I'm sorry.

THE COURT:  I know she's not.  I'm not surprised to hear you say that she didn't do that.

MR. SEDGES:  That's --

THE COURT:  In 2020, what I gather from this, what was taking place is that you received your money on

Discussion re Bank Accounts                                      25

your debit card.  You went to the ATM, you took out cash, you gave it to her, and that was the end of the joint finances between you.

MR. SEDGES:  No.

THE COURT:  You gave her the money that you gave, and you kept the money that you kept.

MR. SEDGES:  No.

THE COURT:  Well, other -- well, then what else was going on in 2020 that we just didn't describe?

MR. SEDGES:  Well, the description, okay, is simply -- and please don't be insulted -- it's not a practical way of looking at it.  You have to look at it this way.  There are many times, okay, many times where Carol and I have this bank account where we would take money out and go on, let's say, a vacation --

THE COURT:  I'm talking -- no, no, no.  Mr. Sedges, I'm talking about just in one year, 2020.

MR. SEDGES:  Right, yeah.

THE COURT:  So were you on a joint bank account with Miss Sedges then?

MR. SEDGES:  No, we never had a joint bank account together.  We had this account since the inception of the marriage, and that's why I was trying to push across to you on the finish line here, is that it acted as a hub. It acted as a hub.  We also --

Discussion re Bank Accounts                                    26

THE COURT:  When -- you said you never had a joint bank account?

MR. SEDGES:  -- we also even -- we also even have a business that we run through it --

THE COURT:  No.

MR. SEDGES:  -- called Pell Systems.

THE COURT:  No, don't -- let's not go down that path.  You don't --

MR. SEDGES:  Sure, why not?  Yeah.

THE COURT:  Did you say that you never had a joint bank account with her?

MR. SEDGES:  No, never had --

THE COURT:  You never did?

MR. SEDGES:  No, from the beginning of our marriage when we first got married, okay, she had -- she had a bank account.  And I just -- to be -- to be quite frank with you, okay, I figured, well, listen, one bank account is enough.  You know, she kind of in a way, you know, we would, you know, bills would come up.  I mean, our checks would go through there when I was working.  Her checks would go there when -- was working.  The tax returns would go through that bank account.  Anchor Program would go through that bank account.  We'd have stimulus checks that go through that bank account.  We have a -- we have a business that we ran.

THE COURT:  So you don't -- so that's a different story is that --

MR. SEDGES:  Okay, then --

THE COURT:  -- if there was joint --

MR. SEDGES:  -- then if it's a different story --

THE COURT:  Mr. Sedges, Mr. Sedges --

MR. SEDGES:  -- then what are we talking about?

THE COURT:  -- Mr. Sedges, if you want to hear something, you need to stop speaking, and then you can hear me --

MR. SEDGES:  I'm sorry.

THE COURT:  -- say something.

MR. SEDGES:  I'm a little excited.  I'm so sorry.

THE COURT:  You could be stating something with the wrong words, which may be a point.  If into the bank account that was only in Mrs. Sedges' name --

MR. SEDGES:  Right.

THE COURT:  -- into that bank account went joint income, joint --

MR. SEDGES:  Right.

THE COURT:  -- tax refunds, joint property tax relief --

MR. SEDGES:  Correct.

THE COURT:  -- it could be that you have an equitable argument as to that money.  But having access --

MR. SEDGES:  Yeah --

THE COURT:  -- I'm still speaking.

MR. SEDGES:  I'm sorry.

THE COURT:  But having access to the bank account is not what's going on.  You didn't have access to the bank account.  You may have had an equitable right to money that went into the account, but that's a different analysis.

MR. SEDGES:  Well, that's why I brought up co-mingling, sir.

THE COURT:  Well, co-mingling is not the word that we would use here, okay.

MR. SEDGES:  Well, look, you know --

THE COURT:  But you were looking for --

MR. SEDGES:  -- I'm doing the best I can.  I don't have representation.

THE COURT:  Mr. Sedges, --

MR. SEDGES:  Yes, sir.

THE COURT:  -- in the past, you were looking for access and use of the bank account and --

MR. SEDGES:  Yeah.

THE COURT:  -- that doesn't seem correct anymore.

MR. SEDGES:  I've always -- I've always had it.

THE COURT:  No, you didn't, because I asked you before, in 2020 what was going on, and what was going on was you were getting your debit card, you were going to the ATM,

Discussion re Bank Accounts /Safety Deposit Box    29

you were taking out cash, giving it to the Plaintiff --

MR. SEDGES:  Right, right.

THE COURT:  -- and keeping some.  And I asked you was she giving you money, and then I asked you were you on the account.  You said, no, we never had a joint account.  Well, if you never have a joint account --

MR. SEDGES:  She doesn't --

THE COURT:  -- then you never had access to the account.

MR. SEDGES:  -- she doesn't have to give me money.

THE COURT:  That's the point.

MR. SEDGES:  If I want money -- if I want money, it's almost --

THE COURT:  All right.

MR. SEDGES:  I want to use the proper words here.

THE COURT:  Mr. Sedges, I've heard enough.  Let's talk about the safety deposit box for a second.  Why did you need access to the safety deposit box?

MR. SEDGES:  Because our marital -- our marital property is in there.

THE COURT:  What's -- what marital property?  What's in there?

MR. SEDGES:  Jewelry.  It's on the CIS, sir.

THE COURT:  So jewelry is in the safety deposit

Discussion re Safety Deposit Box                    30

box.  Okay.  Mr. Dell'Italia, --

MR. SEDGES:  That is correct.

THE COURT:  -- what happened with the access to the safety deposit box?

MR. DELL'ITALIA:  The only jewelry that's in the safety deposit box is jewelry that he had -- that Mr. Sedges had given to Mrs. Sedges over the years.  That's the only thing that's in there.  He never had access to that safety deposit box.

MR. SEDGES:  I never knew it existed until a month ago.

MR. DELL'ITALIA:  No, he knew it existed.

MR. SEDGES:  No, I did not.

THE COURT:  Well, so --

MR. SEDGES:  It's in her brother's name.

THE COURT:  Mr. Sedges --

MR. DELL'ITALIA:  No, it's --

THE COURT:  -- Mr. Sedges, if you didn't know until a month ago, then it couldn't have been by agreement that she was putting things in the safety deposit box.

MR. SEDGES:  It was never -- it was never by agreement.  This is where I'm gonna really get upset.

THE COURT:  Mr. Sedges, listen to what I just said.

MR. SEDGES:  You've got to be kidding me.

THE COURT:  Listen to what I just said.

MR. SEDGES:  I never knew about it.  I told you this in those last --

THE COURT:  Listen to what I just said.  If you didn't know anything about the safety deposit box until a month ago --

MR. SEDGES:  Zero.

THE COURT:  -- then if couldn't have been in 2020 that you had an agreement with her about the safety deposit box, --

MR. SEDGES:  Nothing.

THE COURT:  -- because you didn't know anything about it.  Now, back in 2020, you were giving gifts to her, right?  Those are her gifts.  If she puts together an inventory of what's in the safety deposit box, that should be all that you need to know.

MR. DELL'ITALIA:  We'd be happy to do that, Your Honor.

THE COURT:  Okay, and it's so ordered.  She will do that.

MR. SEDGES:  I don't understand what just -- I don't understand what you just said, sir.  I'm so sorry.

THE COURT:  I'll say it again.  Let me just write it down for myself.

MR. SEDGES:  Sure, of course.

Discussion re Safety Deposit Box                                    32

THE COURT:  What I just said was that I'm gonna have the -- I'm gonna have Mrs. Sedges -- she's going to put together an inventory --

MR. SEDGES:  This is incredible.

THE COURT:  -- of the items in the safety deposit box.

MR. SEDGES:  I've already done that, sir, through a supplication --

THE COURT:  I don't know how you could have done that if you didn't know about the safety deposit box until a month ago.

MR. SEDGES:  Well, I just put -- I just put it in there.  You should have it in front of you.

THE COURT:  No, I don't understand how it could be credible.

MR. SEDGES:  Why can't it be credible?

THE COURT:  Because you only knew --

MR. SEDGES:  I found out about the safety deposit --

THE COURT:  -- about the safety deposit box a month ago.

MR. SEDGES:  -- I -- listen, excuse me --

THE COURT:  Let me -- I'll tell you why.  Mr. Sedges, Mr. Sedges --

MR. SEDGES:  I argued --

Discussion re Safety Deposit Box                                    33

THE COURT:  No, no.

MR. SEDGES:  Excuse me --

THE COURT:  Mr. Sedges, stop, and I'm going to explain it, and then we're going to be finished.  It can't be simultaneously true that you --

MR. SEDGES:  I misspoke.

THE COURT:  -- just found out -- that you just found out about the safety deposit box a month ago.  You've never been in it.

MR. SEDGES:  I misspoke.  I'm saying --

THE COURT:  I'm still speaking.  I'm still speaking.

MR. SEDGES:  Yes, sir.

THE COURT:  This is why --

MR. SEDGES:  Yes, sir.

THE COURT:  -- it's not credible, your position.  It can't be true that you just found out about it a month ago, that you asked for access, that they've denied you access so you've not been in the safety deposit box, but you know for sure what's in it.

MR. SEDGES:  I do, and I'm going to tell you --

THE COURT:  No, you don't.

MR. SEDGES:  -- why I do.  I -- sir, sir --

THE COURT:  It's not credible.

MR. SEDGES:  -- sir, I misspoke when I said -- a

month ago is I was trying to refer to -- I was trying to refer to when we had the Zoom.  Please give me a moment.

THE COURT:  Did you ever have access to the safety deposit box?

MR. SEDGES:  I never had access to it.  I found out about --

THE COURT:  And when did you come to know about it?

MR. SEDGES:  Okay, I'm going to tell you what I know about it.  What I --

THE COURT:  No, I asked you when did you come to know it existed?

MR. SEDGES:  Okay, in -- when I read her CIS is when I -- is when I came to know of the existence.  So I'm very sorry that I misspoke about it when I said a month ago.  I was referring to something different, so I'm very sorry that I misspoke.  But I will tell you something right now.  I found out about the safety deposit box when I was handed the CIS, okay, took a look at it, and it says, "Do you have a safety deposit box?"  It says, "Yes, with brother," okay.  And I turned to her and I said --

THE COURT:  And when was the CIS --

MR. SEDGES:  -- what do you mean you have --

THE COURT:  -- Mr. Dell'Italia?  When was the CIS?

Discussion re Safety Deposit Box                    35

MR. DELL'ITALIA:  Yes.  When was that done?  Oh, I don't have --

MR. SEDGES:  February 4th.  February 4th her CIS was done.

THE COURT:  Of this year?

MR. DELL'ITALIA:  Yes, that's probably right, Your Honor.

THE COURT:  Okay.  So, so what?  So what?  So what?

MR. SEDGES:  What do you mean so what?

THE COURT:  So you don't have, you never had access to the safety deposit box.  You came to know.  She kept it a secret.  You didn't come to know about it, so unless, from February '25 you went into the box, you don't know what's in that box.

MR. SEDGES:  I can't get into the box.  I'm not in the -- I'm not in the --

THE COURT:  That's the point.  That's the point.

MR. SEDGES:  Right.

THE COURT:  So you can't know what's in it.

MR. SEDGES:  I -- I'm gonna tell you what I do know.  I know the amount of jewelry, okay?  You make a very good point, and I understand now, I think what you're trying to say.  I do not absolutely positively know -- you're right -- what's in the safety deposit box, so I

Discussion re Safety Deposit Box                    36

stand corrected, and I'm sorry for that, okay.

THE COURT: All right.

MR. SEDGES: But what I -- what I can tell you, sir, okay, is what I know -- what we have, okay, as far as my memory is concerned -- I'm not senile -- I know what I bought.

THE COURT: But you gave those --

MR. SEDGES: I know what we purchased.

THE COURT: -- okay, so let me ask you this. Did -- is there anything of yours in the house that's missing that you think is in that safety deposit box, or is it just --

MR. SEDGES: No.

THE COURT: -- the gifts that you gave to Mrs. Sedges?

MR. SEDGES: No, there's nothing. No, sir, there's nothing of mine. My jewelry is not in a safety deposit box, no.

THE COURT: Okay, fine. All right.

Counsel, you'll put together the inventory. I'd like to have that by time --

MR. DELL'ITALIA: Yes.

THE COURT: -- we have the return date on the motions.

MR. DELL'ITALIA: I'll get it done this week,

Discussion re Safety Deposit Box                37

Your Honor.

MR. SEDGES:  How can it be trusted?  How can it be trusted?

MR. DELL'ITALIA:  Your Honor, my client is here. Your Honor, she hears exactly what Your Honor is ordering, and I'm emphasizing it to her to make sure it's done, the same as --

THE COURT:  She could --

MR. DELL'ITALIA:  -- what will be done with the Jeep.

THE COURT:  -- you know what she could do, too, to satisfy --

MR. SEDGES:  How can it be trusted.

THE COURT:  -- Mr. Sedges?  She could take little phone photos of anything and everything.  She could just open the door of the safety deposit box, and before she does anything, --

MR. SEDGES:  Yeah, but --

THE COURT:  -- take a picture of what's in there.

MR. SEDGES:  -- she can't be --

THE COURT:  Mr. Sedges, stop.

MR. SEDGES:  Okay, I will.  Sorry.  I apologize. I'm sorry.

THE COURT:  That's all right.  Okay.  That's the best we're going to do, because --

MR. SEDGES:  Okay.

THE COURT:  -- what we're not going to do is be able to chase ghosts.  You know what I mean?  We're not going to chase ghosts.

MR. SEDGES:  I understand.

THE COURT:  We will have what's there.  We'll see what's there.

MR. SEDGES:  Yes, sir.

THE COURT:  And if she shows the inventory and the pictures of everything that's in there, and it's all stuff that you gave her, gifts over the years --

MR. SEDGES:  Yes.

THE COURT:  -- it's gifts that you gave her over the years.

MR. SEDGES:  Okay, and --

THE COURT:  And they're gifts.  They're gifts.

MR. SEDGES:  But they're marital assets, sir.

THE COURT:  No, they're not.  They're gifts.

MR. SEDGES:  Have you ever -- have you had an opportunity to --

THE COURT:  Mr. Sedges, let's cross -- let's see what's in there first before we go any further down this path.  How about that?  I'll leave the door open.

MR. SEDGES:  Yes, sir.

THE COURT:  We'll see what's in there, and then

Colloquy                                          39

you can make your argument about what's marital and what's not.

MR. SEDGES:  Yes, sir.

THE COURT:  Okay.  All right.  I don't think there's anything else to do today.  This was just to catch up, see where the parties are.  The real estate sounds like it's moving along. I'm glad that it's going to get listed, and hopefully we can address at least that.  And the return date for the motions, let me just see what that is.  Looks like, well, it was originally for September 19th, but -- and my Law Clerk's not in today, so I can't tell you what it's been set for.

But, you know what?  Mr. Dell'Italia, I just noticed your notice of motion for reconsideration can't have the right date on there.  It was filed September 25th.

MR. DELL'ITALIA:  Yeah, that's six days after the September 19th, Judge.  You gave an order on September 19th granting --

THE COURT:  No, no, no.  I understand.  What I'm saying is -- oh, you're saying reconsider of the order.

MR. DELL'ITALIA:  But I --

THE COURT:  I'm sorry.  I thought that that was the return date.  Okay.

MR. DELL'ITALIA:  No.

THE COURT:  So the return date is going to be

Colloquy                                    40

more like the end of October.  It's not going to be tomorrow.  It will be more like that 24th.  All right.

MR. DELL'ITALIA:  Exactly.

THE COURT:  You'll get notice.  You'll get notice about it.

MR. SEDGES:  Thank you, Judge.

THE COURT:  Thank you, both.  Have a good rest of the day.

(Proceeding concluded.)

41

CERTIFICATION

I, Jill Campbell, the assigned transcriber, do hereby certify the foregoing transcript of proceedings from 9:55 a.m. to 10:30 a.m., is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate noncompressed transcript of the proceedings as recorded.

/s/ Jill Campbell                    March 6, 2026
Jill Campbell, CET**D-298            Date

KING TRANSCRIPTION
Agency Name